UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

PALMA RASMUSSEN,

                          Plaintiff,

-vs-                                      **Case No.  6:07-cv-1091-Orl-19UAM**

CENTRAL FLORIDA COUNCIL
BOY SCOUTS OF AMERICA, INC.,

                          Defendant.
_____

CENTRAL FLORIDA COUNCIL
BOY SCOUTS OF AMERICA, INC.,

                    Counterclaim Plaintiff
-vs-

PALMA RASMUSSEN, and
KEITH RASMUSSEN,

                  Counterclaim Defendants.
_____

# ORDER

This case comes before the Court on the following:

1.     Motion of Central Florida Council, Boy Scouts of America, Inc. for Summary Judgment (Doc. No. 25, filed Dec. 21, 2007);

2.     Declarations filed in Support of Motion for Summary Judgment (Doc. Nos. 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, filed Dec. 21, 2007);

3.     Response of Plaintiffs/Counterclaim-Defendants and Memorandum in Opposition to Motion for Summary Judgment (Doc. No. 43, filed Jan. 23, 2008);

4.    Affidavits filed in Opposition to Motion for Summary Judgment (Doc. Nos. 44, 45, 46, 47, 48, 49, 50, 51, filed Jan. 23, 2008);

5.    Supplements to Affidavits filed in Opposition to Motion for Summary Judgment (Doc. Nos. 52, 53, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 71, 72, 73, 74, filed Jan. 24, 2008); and

6.    Supplement to Affidavits filed in Opposition to Motion for Summary Judgment (Doc. No. 75, filed Feb. 6, 2008).[1]

## Background

Palma Rasmussen brought this action under the Americans with Disabilities Act ("ADA") and the Florida Civil Rights Act ("FCRA") against the Central Florida Council of the Boy Scouts of America, Inc. ("the Council"), alleging that the Council failed to accommodate her disabilities at a camping retreat and then retaliated against her after she complained about the matter. (Doc. No. 7, filed Oct. 12, 2007, at ¶¶ 5-57.) The Council has filed counterclaims against Mrs. Rasmussen and her husband, Keith Rasmussen, both former Scout Leaders, for an accounting of the finances handled by the Rasmussens and for the alleged conversion of the Council's property. (Doc. No. 17

---

[1]    All of the documents submitted by the Rasmussens were filed late. On January 2, 2008, the Court issued a *Milburn* Order stating that "the Court will take [Defendant's] Motion for Summary Judgment under advisement on January 23, 2008. *Prior to that date*, the adverse party may file affidavit(s) within the purview of the Federal Rules of Civil Procedure 56 in opposition to the Motion." (Doc. No. 40, filed Jan. 2, 2008, at 1 (emphasis added).) The Rasmussens filed a Response to the Council's motion and several supporting affidavits on the evening of January 23, 2008. (Doc. Nos. 43-51.) The next day, they filed supplements to the affidavits. (Doc. Nos. 52-74.) Approximately two weeks later, the Rasmussens filed an additional supplement. (Doc. No. 75, filed Feb. 6, 2008.) Federal Rule of Civil Procedure 6(b) permits the Court to excuse a late filing only upon motion of the late party, and no such motion was filed in this case. However, in the Court's experience, *Milburn* orders have been interpreted before as permitting filing on the "advisement" date, even though the actual language of the order requires filing before the "advisement" date. Moreover, the Eleventh Circuit has interpreted Rule 56 as requiring the district court to make an independent assessment of the merits of a case even when the plaintiff fails to respond to the defendant's motion for summary judgment. *See United States v. 5800 SW 74th Ave.*, 363 F.3d 1099, 1101 (11th Cir. 2004). Accordingly, the Court will consider the documents that were filed on January 23, 2008. Documents filed on or after January 24, 2008, will be excluded from consideration.

at 10-17, filed Nov. 7, 2007.)  The Council now moves for summary judgment on all claims.  (Doc. No. 25.)  The Council argues that it is considered a "private club," does not constitute a place of "public accommodation," and therefore is not subject to the ADA or FCRA.  (*Id.* at 8-19.)  The Council further argues that it entitled to judgment as a matter of law on its counterclaims against the Rasmussens.  (*Id.* at 19-24.)

## A.     The Boy Scouts and the Council

The Central Florida Council, Boy Scouts of America, Inc. is a local council chartered by the Boy Scouts of America.  (Doc. No. 28 at ¶ 5.)  The Council sponsors Scouting programs in seven central Florida counties, encompassing a total of 24,406 child members and 8,630 adult volunteer Scout leaders who participate through local Scout groups called Cub Scout Packs, Boy Scout Troops, and Venture Crews.  (*Id.* at ¶¶ 5-6.)  The Council is a Florida non-profit corporation and is exempt from taxation under section 501(c)(3) of the Internal Revenue Code.  (Doc. No. 28-5 at 2.)  Although the Council is volunteer-run, it has fifty-three full time employees, roughly half of whom are "commissioned Scouting professionals", and the other half provide administrative support.  (Doc. No. 28 at ¶ 6.)

The Boy Scouts of America ("Boy Scouts" or "Scouts") is a private, non-profit organization that was founded in 1910.  (Doc. No. 39 at ¶ 4.)  The purpose of the Scouts, as set out in the 1916 charter, is to "promote, through organization, and cooperation with other agencies, the ability of boys to do things for themselves and others, to train them in Scoutcraft, and to teach them patriotism, courage, self-reliance, and kindred virtues, using the methods which are now in common use by Boy Scouts."  (*Id.*)  The Boy Scouts mission statement declares: "The mission of the Boy Scouts of America is to prepare young people to make ethical and moral choices over their lifetimes by instilling in them the values of the Scout Oath and Law."  (*Id.* at ¶ 7.)  In turn, the Scout Oath states: "On my honor I will do my best to do my duty to God and my country and to obey the Scout

Law; to help other people at all times; to keep myself physically strong, mentally awake, and morally straight." (*Id.*)  Likewise, the Scout Law declares that a Scout is "trustworthy, obedient, loyal, cheerful, helpful, thrifty, friendly, brave, courteous, clean, kind, reverent."[2] (*Id.*)  Membership in the Boy Scouts is open to any boy of the proper age who agrees to accept the Oath.  (*Id.* at ¶ 8.)

Adult volunteers of both sexes play an important role in the Scouts, both as managers of the organization and as role models to the Scouts.  (*Id.* at ¶¶ 16-18.)  Local councils must approve all adult leader applications.  (*Id.* at ¶ 18.)  Furthermore, each adult leader must agree to live by the values of the Scout Oath and Law and subscribe to a "Declaration of Religious Principle" which recognizes "God as the ruling and leading power in the universe." (*Id.* at ¶ 21.)  Consistent with this theme, the majority of the Council's packs, troops, and crews are chartered to religious organizations. (*Id.* at ¶ 23.)

A 2006 Boy Scout publication estimates nationwide membership at 2,938,698 youth members and 1,146,130 adult members.  (Doc. 39-4 at  4.)  These members were organized in 51,469 Cub Scout Packs, 42,811 Boy Scout troops, 8,185 "Varsity Scout teams," and 20,117 "Venturing crews."  (*Id.*)

Outdoor activities play a large role in Scouting, and to meet this end the Council owns a "reservation" in Paisley, Florida.  (Doc. No. 33 at ¶ 4.)  The reservation encompasses 1,627 acres with five camps.  (*Id.*)  Camp La-No-Che is the most heavily used camp, featuring lodging, activity areas, a swimming pool, shooting ranges, a health lodge, a dining hall, and a gift store called the "Trading Post" which is open to the general public.  (*Id.* at ¶ 4; Doc. No. 46 at ¶¶ 1-5.)  The Council employs seven permanent staff members to run the camp.  (Doc. No. 33 at ¶ 8.)  Scouting events occupy the reservation for forty-nine weeks of the year.  (*Id.* at ¶ 9.)  The Council also permits a "few outside public and religious and other nonprofit organizations" to use the camp on some

---

[2]     The Boy Scouts of America sponsors a similar program called "Venturing," which is open to both young men and women.   (Doc. No. 39 at ¶¶ 13-14.)

weekdays and weekends in winter and late-fall.  (*Id.* at ¶ 16.)  In most cases, these organizations allow the Council to use their facilities for meetings, and the Council reciprocates by allowing use of the reservation.  (*Id.*)  The Council has also allowed Elderhostel, a group which provides outdoor activity for the elderly, to use the camp.  (*Id.*)  On one occasion, the Council permitted a staff member to have his wedding at the camp.  (*Id.*)

Council members must pay a fee to use the camp, although the Council awards roughly 100 scholarships per year.  (Doc. No. 7 at ¶ 18.)  In sum, the Council loses approximately $80,000 - $100,000 per year on the camping program, a loss which it attributes to affordable camping fees. (*Id.*)  The Council balances its camping-related losses through donations.  (*Id.*)[3]

## B.    The Rasmussens

Palma and Keith Rasmussen are adult "volunteer leaders" in the Boy Scouts.  (Doc. No. 44 at ¶ 2.)  They have both served in various volunteer positions at different levels in the Council.  (*Id.*) Palma Rasmussen suffers from several physical ailments including Rheumatoid Arthritis, Lupus Erythematosis, and Diabetes.  (*Id.* at ¶ 5.)  Furthermore, her right leg has an interstitial rod from the middle of her femur to the middle of her tibia, requiring use of an electric wheelchair for travel beyond very short distances.  (*Id.*)

For the most part, this lawsuit arises from the Rasmussens' stay at Camp La-No-Che for an event called the "Order of the Arrow: Ordeal Weekend."[4]  (*See id.* at ¶¶ 19-36.)  The Order of the Arrow ("the Order") is an honorary camping society to which child members and adult volunteers

---

[3]    Mrs. Rasmussen points out that the Council enjoyed a $3,300,000 net surplus in the last year. (*Id.*)  However, this fact will not be considered because it is contained in evidence that was submitted after the date the Court took the motion for summary judgment under advisement.  (Doc. No. 74-4, filed Jan. 24, 2008, at 2.)  Likewise, Mrs. Rasmussen's evidence concerning rentals of the camp to outside organizations was filed late and will be excluded from consideration.  (Doc. Nos. 73-4, 74-5, 74-6, 74-7, 74-8, filed Jan. 24, 2008.)

[4]    Mrs. Rasmussen also alleges discrimination during a 2005 "Fall Council Camporee." She contends that the event was held in an area that "was inaccessible to her and other disabled members."  (Doc. No. 7 at ¶ 44.)

are elected by their peers.  (*Id.*)  Scout literature describes the "Ordeal Weekend" as an introspective camping weekend, where the participants experience "a fourfold Ordeal that includes sleeping alone, silence, work, and a limited amount of food."  (Doc. No. 38-4 at 2; Doc. No. 44 at ¶¶ 18-19.)  Mrs. Rasmussen requested that her fellow Scout leaders and husband nominate her for membership in the Order, which they did.  (Doc. No. 37 at ¶ 19.)  Aware of the limitations posed by her physical ailments, Mrs. Rasmussen forwarded her medical records to the Order planning coordinator for accommodation during the Ordeal weekend.  (*Id.*; Doc. No. 44 at ¶ 24.)

The parties dispute what occurred during the actual weekend.   The affidavits provided by the Council state that it accommodated Mrs. Rasmussen by (1) allowing her to sleep in the Health Lodge with a female roommate, unlike other inductees who slept alone in the woods; (2)  excusing her from physical labor; (3) providing her with a golfcart and driver; and (4) excusing her from hiking five to eight miles like the other inductees.  (Doc. No. 38 at ¶ 7.)  The Council's affidavits also contend that it allowed her access to her service dog, even though she did not request access ahead of time, and that it did not serve shellfish, the only dietary limitation for which she requested accommodation.  (Doc. No. 38-6 at 2; Doc. No. 37 at ¶¶ 18, 20.)

 Palma Rasmussen's affidavit states that she was greeted with hostility from the minute she arrived at the camp.  (Doc. No. 44 at ¶ 25.)  At check-in, the staff was surprised that she needed disability accommodations and was required to make "improvised" accommodations.  (*Id.*)  She slept in the Health Lodge, which did not feature a handicap-accessible bathroom.  (*Id.*)  Since her roommate was asthmatic, Mrs. Rasmussen's service dog was not permitted to sleep in the lodge with her.  (*Id.*)  At various points, she heard rude and offensive comments directed at her.  (*See id.* at ¶¶ 25, 27-28, 31.)  She received very little food during the weekend, some of which she could not consume because she is lactose intolerant.  (*Id.* at ¶¶ 28-29.)  She was also left alone for periods of time in the woods, denied access to her wheelchair for most of the day, and was unable to use the

restroom for nearly an entire day.  (*Id.* at ¶¶ 27-28.)  During a nighttime campfire, she was required to sit on a log for three hours despite being cold and in tremendous pain.  (*Id.* at ¶ 30.)  Regarding the general accessibility of the facilities, Mrs. Rasmussen states that the parking for the dining hall is nearly a quarter mile away, making the hall inaccessible for a handicapped individual.  (*Id.* at ¶ 25.)  She also contends that the gift shop was inaccessible, and that she would have visited it had she been able.  (*Id.* at ¶ 26.)

After the Ordeal weekend, the Rasmussens approached the Council about what they felt was a very negative experience.  (*Id.* at ¶ 34.)  The Council executive, Ron Oats, said that he would instruct the Order leadership to apologize, but he was unwilling to do anything more.   (*Id.*)  Unhappy with the Council's response, Mrs. Rasmussen filed this lawsuit on June, 26, 2007.  (*Id.* at ¶ 7.)

On September 26, 2007, the Good Shepard Lutheran church decided to not renew the charter of the Rasmussens' three scouting units, pack 700, troop 700, and crew 700.  (*Id.* at ¶ 55.)  On October 18, 2007, the Council was served with Mrs. Rasmussen's Amended Complaint.  (Doc. No. 9, filed Oct. 19, 2007.)  Three weeks later, on November 5, 2007, the Council decided to remove the Rasmussens as volunteer leaders.[5]  (Doc. No. 28 at ¶¶ 18-21; Doc. No. 44 at ¶ 70.)

Representatives of the Council state that the decision to remove the Rasmussens was prompted by information discovered during an investigation of the claims in the Amended Complaint.  (Doc. No. 28 at ¶ 18.)  According to the Council, the Rasmussens borrowed funds from the Pack 700 account to pay for the filing of tax exemption documents for a "Parents Association" which the Rasmussens and other parents started.  (Doc. No. 34 at ¶¶ 5-6.)  Furthermore, the Rasmussens deposited checks made out to Troop 700 in the bank account for Crew 700,

---

[5]     The Rasmussens' removal as adult leaders came approximately two and half hours after a television story about this dispute aired on a local news program.  The Council's Answer and Counterclaims were filed on the same day.  (Doc. No. 44 at ¶ 70.)

intermittently used a personal account to deposit checks made out to Troop 700, failed to use the "Troop stamp" for certain checks, and could not provide a explanation why Troop funds went from $2,700 in August of 2007 to $0 three months later.  (Doc. No. 37 at ¶ 5; Doc. No. 37-4.)  Regarding Crew 700, the Council states that the Rasmussens created clothing for members and parents, instructed parents to write the check to Crew 700, and then directly reimbursed themselves from the Crew 700 funds.  (Doc. No. 37 at ¶¶ 27-28.)

Finally, the Council states that Pack 700, Troop 700, and Crew 700 purchased with their funds "various camping, sporting and other outdoor equipment, such as trailers, canoes, cookware and tents."  (Doc. No. 25 at 21.)  The units purchased this gear both before and after the Rasmussens assumed leadership positions.  (Doc. No. 36 at ¶¶ 13-14; Doc. No. 37-3.)  Boy Scouts of America rules and regulations provide that "all property acquired by a unit . . . shall be deemed to be received or acquired solely for the benefit of Scouting as interpreted and promoted by the Boy Scouts of America."  (Doc. No. 39-3 at 19.)  When a unit's charter is revoked, the regulations state that "equipment which may have been secured as property of the unit shall be held in trust by the chartering organization or the chartered local council, as may be agreed upon, pending reorganization of the unit or for the promotion of the program of the Boy Scouts of America." (*Id.* at 20.)  The Good Lutheran Shepard Church has assigned its rights to the equipment to the Council. (Doc. No. 35-4 at 2.)   The equipment is currently being kept in a storage shed on the Rasmussens' property. (Doc. No. 35 at ¶¶ 5-6.)

The Rasmussens respond that they have always deposited checks made out to Troop and Crew 700 into the accounts belonging to these units.  (Doc. No. 44 at ¶ 68; Doc. No. 45 at ¶ 55.)  The Rasmussens personally endorsed some checks made out to these units because they were "on the account as signers."  (Doc. No. 44 at ¶ 68; Doc. No. 45 ¶ 55.)

Regarding the equipment, the Rasmussens state that in September of 2006, the "parents, leaders, and committee of Pack, Troop, and Crew 700, voted as a group unanimously, to form a parents association." (Doc. No. 44 at ¶ 66.)  The formation of the group was prompted by a recent "Scouts Parents initiative to better engage parents in the building of the Scouting Program." (*Id.*) At the same meeting, the committee of Pack, Troop, and Crew 700 "unanimously agreed to transfer all Pack, Troop, and Crew funds to the Parents Association." (*Id.* at ¶ 67.)  Thus, argue the Rasmussens, the property did not belong to the units at the time the charters expired. (Doc. No. 43 at 15.)

## Standard of Review

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004).  An issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case. *Hickson Corp.*, 357 F.3d at 1259.  An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.* at 1260.  A court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.*; *Anderson*, 477 U.S. at 251-52.

The party moving for summary judgment has the burden of proving that: (1) there is no genuine issue as to any material fact, and (2) it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving

party.  *Anderson*, 477 U.S. at 255.  The court may not weigh conflicting evidence or weigh the credibility of the parties.  *Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir. 1993).  If a reasonable fact finder could draw more than one inference from the facts and that inference creates an issue of material fact, a court must not grant summary judgment.  *Id.*  On the other hand, summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial."  *Celotex Corp.*, 477 U.S. at 322.

## Analysis

**I.     Mrs. Rasmussen's Claims against the Council**

### A.      Claims under the ADA

Congress enacted the ADA in 1990 to combat what it perceived as widespread discrimination against disabled individuals.  *PGA Tour Inc. v. Martin*, 532 U.S. 661, 674-76 (2001) (citing 42 U.S.C. § 12101(a)(2) (2006)).[6]  The Act sweeps broadly, forbidding discrimination against disabled individuals in employment (Title I), public services (Title II), and public accommodations (Title III).  *Id.* at 675.  Mrs. Rasmussen asserts four claims under the ADA: (1) a discrimination claim under Title I of the ADA; (2) a retaliation claim under Title I of the ADA; (3) a failure to accommodate claim under Title III of the ADA arising from the Ordeal weekend; and (4) a failure to accommodate claim under Title III of the ADA arising from a previous camping trip.  (Doc. No. 7 at ¶¶ 5-57.)

#### 1.      Title III of the ADA

Mrs. Rasmussen contends that the Council is subject to Title III of the ADA because it owns and operates camps which feature lodging areas, recreation areas, dining areas, and a gift shop.  (Doc. No. 43 at 9-15.)  The Council argues that its ownership of the camps is meaningless because

---

[6]      The Council's motion for summary judgment does not contest whether Mrs. Rasmussen is disabled within the meaning of the ADA.  Accordingly, the Court expresses no opinion on this matter.

the Council itself is a private club and the camps are not a "place of public accommodation." (Doc. No. 25 at 17-24.)

Title III prescribes as a "general rule" that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation." 42 U.S.C. § 12182(a).

The phrase "public accommodation" is defined in terms of "twelve extensive categories, which the legislative history indicates 'should be construed liberally' to afford people with disabilities 'equal access' to the wide variety of establishments available to the non-disabled." *Martin*, 532 U.S. at 676-677 (citing S. Rep. No. 101-116, P. 59 (1989); H.R. Rep. No. 101-485, pt. 2, P. 100 (1990); U.S. Code Cong. & Admin. News 1990, pt. 2, at pp. 303, 382-383). These categories include:

> (A) an inn, hotel, motel, or other place of lodging, except for an establishment located within a building that contains not more than five rooms for rent or hire and that is actually occupied by the proprietor of such establishment as the residence of such proprietor;
> (B) a restaurant, bar, or other establishment serving food or drink;
> (C) a motion picture house, theater, concert hall, stadium, or other place of exhibition or entertainment;
> (D) an auditorium, convention center, lecture hall, or other place of public gathering;
> (E) a bakery, grocery store, clothing store, hardware store, shopping center, or other sales or rental establishment;
> (F) a laundromat, dry-cleaner, bank, barber shop, beauty shop, travel service, shoe repair service, funeral parlor, gas station, office of an accountant or lawyer, pharmacy, insurance office, professional office of a health care provider, hospital, or other service establishment;
> (G) a terminal, depot, or other station used for specified public transportation;
> (H) a museum, library, gallery, or other place of display or collection;
> (I) a park, zoo, amusement park, or other place of recreation;
> (J) a nursery, elementary, secondary, undergraduate, or postgraduate private school, or other place of education;
> (K) a day care center, senior citizen center, homeless shelter, food bank, adoption agency, or other social service center establishment; and
> (L) a gymnasium, health spa, bowling alley, golf course, or other place of exercise or recreation.

*Id.* § 12181(7).  Because the list is so expansive, the Eleventh Circuit has reasoned that Congress intended the term "public accommodation" to be limited to the places enumerated by section 12181(7).  *Stevens v. Premier Cruises, Inc.*, 215 F.3d 1237, 1241 (11th Cir. 2000) ("Because Congress has provided such a comprehensive definition of 'public accommodation,' we think that the intent of Congress is clear enough."); *see also Access Now, Inc v. Southwest Airlines, Inc.*, 227 F. Supp. 2d 1312, 1318 (S.D. Fla. 2002).  When a property contains both areas that are enumerated by section 12181(7) and areas that are not, the plaintiff may only bring an action related to denial of access to the enumerated areas.  *See Stevens*, 215 F.3d at 1241 (finding that Title III covered areas of a cruise ship which were enumerated by section 12181(7) while non-enumerated areas were not covered).

Even if an organization operates a "place of public accommodation," it is nevertheless excluded from coverage under the ADA if it is a "private club[] or establishment[] exempted from coverage under title II of the Civil Rights Act of 1964 (42 U.S.C. 2000-a(e)) [42 U.S.C.A. § 2000a et seq.] . . . ."  42 U.S.C. § 12187.  The statute to which this provision refers, Title II of the Civil Rights Act, states that "[this Act] shall not apply to a private club or other establishment not in fact open to the public, except to the extent that the facilities of such establishment are made available to the customers or patrons of an establishment within the scope of subsection (b) of this section." 42 U.S.C. § 2000a(e) (emphasis added).

### a.        Whether the Council Owns, Leases, or Operates a Place of Public Accommodation

The Council argues that Title III does not apply to this case because "Central Florida Scouting" is not a place of public accommodation under the ADA.  The Council relies heavily on *Welsh v. Boy Scouts of Am.*, 993 F.2d 1267, 1269 (11th Cir. 1993), in which the Seventh Circuit Court of Appeals held that the Boy Scouts of America could not be sued under Title II of the Civil Rights Act for refusing to admit an atheist to its membership.  Like the ADA, Title II enumerates a

list of "establishments" which fall under its purview, including inns, hotels, motels, restaurants, cafeterias, lunchrooms, motion picture houses, and theaters.  42 U.S.C. § 2000a(b)(1)-(4).  The court reasoned that "membership clubs" were not included in this list, and to assume that Congress intended to include such clubs under the act would be equivalent to holding that an ordinance "requiring the licensing of all dogs" similarly required the "licensing of cats."  *Id.* at 1269 (internal quotations omitted).  Furthermore, even though the Scouts owned and operated facilities which fell under section 2000a(b), the court held that membership in such a club did not qualify as a place of public accommodation unless "membership merely serves as a means of access . . . to a physical location or a facility."  *Id.* at 1271.  Membership in Scouting went beyond "means of access" to its facilities because the organization was primarily focused on interpersonal relationships, not physical facilities.  *Id.* at 1273-74.

Despite the factual similarities between *Welsh* and this case, the Council's reliance on *Welsh* is somewhat misplaced, at least for purposes of the  "public accommodation" issue.  The specific holding of *Welsh* is that membership in a "membership organization" does not constitute a place of public accommodation.  *Welsh*, 993 F.2d at 1269.   The plaintiff in that case was an atheist who was denied *membership* to the Scouts.  By contrast, Mrs. Rasmussen is a member of the Council who alleges that she was denied access to the Council's *facilities.*  These facilities are literally "places." Although some language in *Welsh* sweeps broadly, it must be read in light of the question presented to the court: whether "membership" in an organization qualifies as a place of public accommodation.

Mrs. Rasmussen alleges that she was denied access to a lodging establishment, a gift shop, and recreation areas.  These types of facilities are all enumerated by 42 U.S.C. section 12181(7)) and therefore qualify as "place[s] of public accommodation" for purposes of her Title III claim.  42 U.S.C. §§ 12181(7), 12182(a).

### b.      Whether the Council is a Private Club

The Council argues that it is not subject to the Title III because it is a "private club." (Doc. No. 25 at 13.) Again, the Council relies heavily on *Welsh* which concluded that the Boy Scouts of America was a private club within the meaning of Title II of the Civil Rights Act. *Welsh*, 993 F.2d at 1276. Because Title III of the ADA cross-references Title II of the Civil Rights Act for the definition of "private club," the Council urges that *Welsh* stands for direct authority that the Council is a private club. (Doc. No. 25 at 13.)

*Welsh* considered seven factors in determining whether the Boy Scouts were a private club: (1) the genuine selectivity of the group; (2) the membership's control over the operations of the establishment; (3) the history of the organization; (4) the use of the facilities by nonmembers; (5) the club's purpose; (6) whether the club advertises for members; and (7) whether the club is nonprofit or for profit.[7] *Welsh*, 993 F.2d at 1276. The court reasoned that the most important factor was the selectivity of the group. Although the Boy Scouts had millions of members, the court found that it demonstrated "a plan or purpose of exclusiveness" because it required members to adhere to the Scout Oath and Law, as well as profess their belief in God. *Id.* at 1276-77 (citing *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 236 (1969)).[8] The Court noted that the history of the club was consistent with this theme of selectivity. *Id.* at 1277. Furthermore, the groups's purpose was to train

---

[7]      The factors considered by the Seventh Circuit appear to be derived from a district court decision within that circuit. *Welsh*, 993 F.2d at 1276. The Eleventh Circuit has not opined on the proper facts to consider when determining whether an entity is a private club for purposes of Title III, but at least one district court within the Eleventh Circuit has applied the *Welsh* factors on similar facts to this case. *Roman v. Concharty Council of the Girl Scouts, Inc.*, 195 F. Supp. 2d 1377, 1381 (M.D. Ga. 2002).

[8]      In *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 656 (2000), the U.S. Supreme Court determined that the application of a New Jersey law requiring the Scouts to accept homosexual members would violate the members' rights to "expressive association" under the First Amendment. A central policy consideration in that case was the Court's reluctance to allow states to dictate membership criteria to private groups. *See id.* Thus, *Dale*, which was decided seven years after *Welsh*, further supports the Seventh Circuit's conclusion that the Scouts are a private club.

young boys to live according the Scout law and Oath. *Id.* Finally, the Boy Scouts' status of a non-profit organization suggested that it was most accurately characterized as a private club. *Id.*

The facts in this case dictate the same outcome. The Council is a charted organization of the Boy Scouts, and the Council similarly requires its members to adhere to the Scout Oath, Scout Law, and a monotheistic belief in God. (*See*, *e.g.*, Doc. No. 39.) The Council shares its history with the Boy Scouts, has the same purpose as described in *Welsh*, and it is a non-profit organization. (*Id.*) Although the group has a large membership and appears to actively recruit new members, the balance of the *Welsh* factors weigh strongly in favor of private club status.

However, the Council's status as a private club does not end the inquiry. 42 U.S.C. section 2000a(e) states that "[this Act] shall not apply to a private club or other establishment not in fact open to the public, except to the extent that the facilities of such establishment are made available to the customers or patrons of an establishment within the scope of subsection (b) of this section." Thus, the private club exception does not apply when the private club makes certain facilities open to the public. *Id.*; *see also Clegg v. Cult Awareness Network*, 18 F.3d 752 at 755 n.3 (9th Cir. 1994) ("Congress thus has drawn a distinction between the organization—a private club—and the facilities the organization operates. Only when the facilities are open to the public at large does Title II govern."); *Welsh v. Boy Scouts of Am.*, 787 F. Supp. 1511, 1533-34 (N.D. Ill. 1992) ("[T]he statute recognizes a distinction between organizations *per se* and organizations which operate the sorts of facilities cited as 'places of public accommodation'. . . .")

The evidence establishes that one part of the camp, a gift shop called the Trading Post, was "open to the public." (*See* Doc. No. 46 at 1-2 (affidavit of an ADA inspector who inspected the Trading Post gift shop).) Therefore, Mrs. Rasmussen can maintain a cause of action for the Council's failure to accommodate her in the Trading Post. *See Stevens*, 215 F.3d at 1241.

Mrs. Rasmussen argues that remainder of the camp was open to non-Scout affiliated groups and thus "open to the public," but there is no evidence in record to support this argument.  In its discretion, the Council occasionally allowed non-Scout groups to utilize the camp's facilities, and typically these groups were associated with the Council in some manner.  (*See* Doc. No. 33 at ¶¶ 16-17; Doc. No. 33-3.)  In total, non-members accounted for only 4% of campers during 2006.  (Doc. No. 33 at ¶ 16.)  In this sense, the camp was unlike a swimming pool or golf course which is open to all members of the public who meet an objective criteria.  *Compare*, *e.g.*, *Anderson v. Pass Christian Isles Golf Club, Inc.*, 488 F.2d 855, 857 (5th Cir. 1974).  Thus, with the exception of the gift shop, the camp was not "open to the  public" within the plain and normal meaning of the term.[9]

Accordingly, Mrs. Rasmussen may maintain a cause of action under Title III of the ADA only to the extent she claims that the Trading Post failed to accommodate her disabilities.[10]

## 2.      Title I of the ADA

Mrs. Rasmussen claims that the Council is also subject to Title I of the ADA because she was an "employee" of the Council.  (Doc. No. 43 at 2-9.)  The Council argues that Mrs. Rasmussen was a volunteer rather than an employee, and that the Council is a "bona fide private membership club" exempt from coverage under Title I.  (Doc. No. 25 at 13-18.)

---

[9]      Much of the evidence Mrs. Rasmussen provided in support of this argument was excluded because it was filed late.  (Doc. Nos. 73-4, 73-5, 74-6, 74-7, 74-8, filed Jan. 24, 2008.) However, even if the Court were to consider this evidence, the result would not change.  All five of these documents appear to be print-outs from a website.  There is no explanation of the documents' relevance or any indication of their authenticity.  *See Ross v. Corp. of Mercer Univ.*, 506 F. Supp. 2d 1325, 1338 (M.D. Ga. 2007) (discussing authenticity and identification of summary judgment evidence under Federal Rule of Evidence 901).  Mrs. Rasmussen has also failed to present any evidence that the 2005 Fall Camporee was "open to the public."

[10]      Mrs. Rasmussen also argues that the Council has voluntarily placed itself under coverage of the ADA by adopting a code of conduct which requires facilities to be in compliance with the ADA. (Doc. No. 43 at 12-13.) However, she does not point to any legal authority which recognizes "waiver" as a basis of finding liability under the ADA.

Title I of the ADA declares that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The term "employer" is basically defined as a person or entity that has "employees." *Id.* § 12111(5)(A). To round out this circular definition, the statute defines "employee" as an "individual employed by an employer." *Id.* § 12111(4). The elusive statutory definition has prompted courts to turn to other federal statutes and common law principles to determine who constitutes an employee. *See, e.g.*, *Huck v. Mega Nursing Servs., Inc.*, 989 F. Supp. 1462, 1463 (S.D. Fla. 1997).

While the general definition of a covered entity is vague, Congress did choose to exempt specific entities from coverage under Title I of the ADA. Relevant to this case, Title I states that "[t]he term 'employer' does not include . . . a bona fide private membership club (other than a labor organization) that is exempt from taxation under section 501(c) of Title 26." 42 U.S.C. § 12111(5)(B)(ii). To qualify as a bona fide private membership club, an organization must be: (1) an association of persons for social or recreational purposes or for the promotion of some literary, scientific or political objective; (2) legitimate; (3) private; and (4) require some meaningful conditions of limited membership." *Roman*, 195 F. Supp. 2d at 1383-83 (citing *Quijano v. Univ. Fed. Credit Union*, 617 F.2d 129, 131-133 (5th Cir. 1980)).[11] Except for the additional requirement that a private membership club be tax-exempt, there is "no functional distinction between a private club under Title II [of the Civil Rights Act] and a private membership club under Title VII and [Title I of] the ADA." *Id.* at 1380, 1380 n.6.

---

[11]     In *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir. 1981), the Eleventh Circuit adopted the decisions of the United States Court of Appeals for the Fifth Circuit that were handed down prior to October 1, 1981 as binding precedent.

The Court has previously held that the Council is a "private club" under Title II of the Civil Rights Act, and it is undisputed that the Council is exempt from taxation under section 501(c) of Title 26.  Furthermore, the Council meets the Fifth Circuit's four-part test for qualification as a bona fide private membership club.  The purpose of the Council is to "promote, through organization, and cooperation with other agencies, the ability of boys to do things for themselves and others, to train them in Scoutcraft, and to teach them patriotism, courage, self-reliance, and kindred virtues, using the methods which are now in common use by Boy Scouts."  (Doc. No. 39 at ¶ 4.)  The Council is "legitimate," as opposed to being a private organization designed for the purposes of flouting civil rights statutes.  *See Quijano*, 617 F.2d at 132.  Furthermore, as previously discussed in length, the Council is "private" and has "meaningful conditions of limited membership."

Accordingly, the Council is exempt from coverage under Title I of the ADA.[12]

## B.     The FCRA

Mrs. Rasmussen asserts a public accommodations claim under the FCRA for the Council's failure to accommodate her at camp La-No-Che and during a previous camping trip.  The Council argues that the FCRA does not apply to Mrs. Rasmussen's claims because the FCRA excludes facilities like the Council's camps.  Mrs. Rasmussen does not address this issue in her response to the Council's motion.

The FCRA provides that:

> Any violation of any Florida statute making unlawful discrimination because of race, color, religion, gender, national origin, age, handicap, or marital status in the areas of education, employment, housing, or public accommodations gives rise to a cause of action for all relief and damages described in s. 760.11(5), unless greater damages are expressly provided for.

Fla. Stat. § 760.07 (2007).  Section 413.08(2) of the Florida Statutes declares that "[a]n individual with a disability is entitled to full and equal accommodations, advantages, facilities, and privileges

---

[12]     It is therefore unnecessary to determine whether Mrs. Rasmussen was an "employee" for purposes of Title I.

in all public accommodations." However, under the FCRA, "[t]he term 'public accommodations' does not include lodge halls or other similar facilities of private organizations which are made available for public use occasionally or periodically." Fla. Stat. § 760.07.

No reported Florida cases have discussed the "private organizations" exemption to the FCRA, and the Court will therefore turn to federal law for guidance.[13] The Council is both a "private club" within the meaning of Title III of the ADA and a "bona fide private membership club" within the meaning of the Title I of the ADA. In plain English, a "private club" qualifies as a type of "private organization," because a club is necessarily an organization. Thus, the term "private organization" appears to be as broad in application, if not broader, than the term "private club." As a result, the Council's status as a "private club" under federal law qualifies it as a "private organization" within the meaning of the FCRA.

Moreover, with the exception of the Trading Post, the camp is made available for public use only "occasionally or periodically." (Doc. No. 33 at ¶¶ 16-17.) Accordingly, the "private organization" exception to § 760.07 applies, and Mrs. Rasmussen may maintain a cause of action under FCRA only to the extent she claims that the Trading Post failed to accommodate her disabilities.

## II.     The Council's Counterclaims against the Rasmussens

### A.     The Council's Request for an Accounting

The Council requests an accounting of the Rasmussens' handling of their units' finances between August of 2005 and November of 2007. (Doc. No. 25 at 24-27.) The Council points to several "dubious transactions" with respect to the Pack, Troop, and Crew accounts. (*Id.*) The

---

[13]     Federal courts often look to ADA case law when examining claims under the FCRA. *See*, *e.g.*, *Reis v. Universal City Dev. Partners*, 442 F. Supp. 2d 1238, 1243 (M.D. Fla. 2006).

Rasmussens respond that the "$371.50 claimed by the Council is explained" in their affidavits.  (Doc. No. 43 at 15.)

Under Florida law, "whenever there is a fiduciary relation such as that of trustee, agent, executor, etc., the right to an accounting in equity is undoubted."  *Ross v. Stanley*, 346 F.2d 645, 649 (5th Cir. 1965) (quoting *Royal Indem. Co. v. Knott*, 136 So. 474, 478 (Fla. 1931)).  Accordingly, the only question before the Court is whether a fiduciary relationship existed between the Rasmussens and the Council.

Florida law extends a fiduciary relationship to "to every possible case . . . in which there is confidence reposed on one side and the resulting superiority and influence on the other . . . . The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in and relies upon another."  *Masztal v. City of Miami*, 971 So. 2d 803, 809 (Fla. 3d DCA 2007) (quoting *Quinn v. Phipps*, 113 So. 419, 421 (1927)) (alterations in original).  An implied fiduciary relationship results when "there is a degree of dependency on one side and an undertaking on the other side to protect and/or benefit the dependent party."  *Id.* (citing *Maxwell v. First United Bank*, 782 So. 2d 931, 933 (Fla. 4th DCA 2001)).  The Rasmussens admit to being in "positions of trust with respect to Pack 700, Troop 700, and Crew 700" during the relevant time period, and they admit to controlling the finances of these groups.  (Doc. No. 23 at ¶¶ 3-4; Doc. No. 24 at ¶¶ 3-4.) These facts are sufficient to imply the existence of a fiduciary duty between the Rasmussens and the Council.

The Rasmussens' explanation of how they handled "[t]he $371.50 claimed by the Council" in their affidavits is irrelevant to the question of whether an accounting is required.  First, the affidavits do not address all of the Council's concerns, including the depletion of $2,700 from Troop 700's account.  More importantly, the right to an accounting in equity does not require a showing of wrongdoing.  *Ross*, 346 F.2d at 649.  The mere existence of fiduciary relationship is sufficient to

establish the fiduciary's liability for an accounting.  *See id.*  Finally, the Rasmussens do not invoke

any equitable defenses, and there is no indication that the Council's request for an accounting is

lodged in bad faith.  Therefore, the Council has a right to an accounting of the Rasmussens' handling

of the finances of Pack 700, Troop 700, and Crew 700 from August of 2005 to November of 2007.

### B.      The Council's Claim for Conversion

The Council claims that Rasmussens have converted "camping, sporting, and other outdoor

equipment, such as trailers, canoes, cookware and tents" that is owned by the Council.  (Doc. No. 25

at 22.)  The Rasmussens respond that "the tangible property is owned by an association and not the

council." (Doc. No. 43 at 15.)              Conversion is "an unauthorized act which deprives another of

his property, permanently or for an indefinite time."  *Furmanite Am. Inc. v. T.D. Williamson, Inc.*,

506 F. Supp. 2d 1134, 1143 (M.D. Fla. 2007); *see also Senfeld v. Bank of Nova Scotia Trust Co.*

*(Cayman) Ltd.*, 450 So. 2d 1157, 1160-61 (Fla. 3d DCA 1984). Conversion may be established by

the demand of a party with rights to the property and the refusal of the party in possession to return

the property.  *Senfeld*, 450 So. 2d at 1161.

Boy Scouts of America rules and regulations provide that property acquired by Scouting units

"shall be deemed to be received or acquired solely for the benefit of Scouting as interpreted and

promoted by the Boy Scouts of America." (Doc. No. 39-3 at 19.)  Furthermore, when a unit's charter

expires, the unit's property "shall be held in trust by the chartering organization or the chartered local

council, as may be agreed upon, pending reorganization of the unit or for the promotion of the

program of the Boy Scouts of America." (*Id.* at 20.)  However, the Rasmussens' affidavits state that

the units transferred their property to an independent parents association in 2006, well before the

units' charters expired.  (Doc. 44 at ¶¶ 66-67.)  The Council does not point to any regulation or other

evidence which would make such a transfer ineffective.  Accordingly, the Council is not entitled to

judgment as a matter of law, and summary judgment cannot be granted on its conversion claim.

**Conclusion**

Based on the foregoing, the Motion of Central Florida Council, Boy Scouts of America, Inc. for Summary Judgment (Doc. No. 25, filed Dec. 21, 2007) is **GRANTED** in part and **DENIED** in part as follows:

1.      Summary Judgment is **GRANTED** in favor of Central Florida Council, Boy Scouts of America, Inc. and against Palma Rasmussen with respect to Counts I, II, and IV of the      Amended Complaint (Doc. No. 7, filed Oct. 12, 2007).   Summary Judgment is **GRANTED** in favor of Central Florida Council, Boy Scouts of America, Inc. and against Palma Rasmussen  with respect to Counts III and V of the Amended Complaint (Doc. No. 7, filed Oct. 12, 2007), except to the extent Counts III and V concern the accessibility of the Trading Post.  Counts III and V remain pending before the Court to the extent they concern the accessibility of the Trading Post.

2.      Summary Judgment is **GRANTED** in favor of Central Florida Council, Boy Scouts of America, Inc. and against Palma Rasmussen and Keith Rasmussen with respect  to Count I of the Counterclaim (Doc. No. 17, filed Nov. 7, 2007); and

3.      Summary Judgment is **DENIED** with respect to Count II of the Counterclaim (Doc. No. 17, filed Nov. 7, 2007).

       **DONE** and **ORDERED** in Chambers in Orlando, Florida on March _6__, 2008.


_____
PATRICIA C. FAWSETT, CHIEF JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:

Counsel of Record