PALMA RASMUSSEN,

                Plaintiff,

-vs-                                          **Case No. 6:07-cv-1091-Orl-19GJK**

CENTRAL FLORIDA COUNCIL
BOY SCOUTS OF AMERICA, INC.,

                Defendant.
_____

CENTRAL FLORIDA COUNCIL
BOY SCOUTS OF AMERICA, INC.,

                Counterclaim Plaintiff,

-vs-

PALMA RASMUSSEN, and
KEITH RASMUSSEN,

                Counterclaim Defendants.
_____

# ORDER

This case comes before the Court on the following:

1.    Motion of Central Florida Council Boy Scouts of America, Inc. ("the Council") for Summary Judgment on Palma Rasmussen's Claim Under the Americans with Disabilities Act ("ADA") and the Council's Claim for Conversion (Doc. No. 100, filed July 29, 2008);

2.    Declarations filed by the Council in Support of its Motion for Summary Judgment (Doc. Nos. 102-116, filed July 29, 2008);

3.    Amended Exhibits Filed by the Council in Support of its Motion for Summary Judgment (Doc. Nos. 117-2 to -3, filed July 30, 2008);

4.    Response in Opposition of Palma and Keith Rasmussen to the Council's Motion for Summary Judgment (Doc. No. 120, filed Aug. 29, 2008);

5.    Motion of Palma Rasmussen for Summary Judgment on her Claim Under the ADA (Doc. No. 122, filed Sept. 8, 2008);

6.    Affidavits and Exhibits Filed by Palma Rasmussen in Support of her Motion for Summary Judgment (Doc. Nos. 122-2 to -8, filed Sept. 8, 2008; Doc. No. 127, filed Oct. 3, 2008);

7.    Declarations filed by the Council in Opposition to Palma Rasmussen's Motion for Summary Judgment (Doc. Nos. 128-135, filed Oct. 13, 2008);

8.    Response in Opposition of the Council to Palma Rasmussen's Motion for Summary Judgment (Doc. No. 137-2, filed Oct. 14, 2008);

9.    Motion of Palma and Keith Rasmussen for Summary Judgment on the Council's Claim for Conversion (Doc. No. 144, filed Oct. 24, 2008);

10.   Affidavit of Palma Rasmussen filed in Support of Palma and Keith Rasmussen's Motion for Summary Judgment (Doc. No. 144-2, filed Oct. 24, 2008);

11.   Motion of the Council for Summary Judgment on its Claim for Accounting (Doc. No. 149, filed Nov. 3, 2008);

12.   Declarations filed by the Council in Support of its Motion for Summary Judgment (Doc. Nos. 150-155, filed Nov. 3, 2008);

13.   Response in Opposition of the Council to Palma and Keith Rasmussen's Motion for Summary Judgment (Doc. No. 157, filed Nov. 26, 2008);

14.   Declarations filed by the Council in Opposition to Palma and Keith Rasmussen's Motion for Summary Judgment (Doc. Nos. 158-162, filed Nov. 26, 2008);

15.   Response in Opposition of Palma and Keith Rasmussen to the Council's Motion for Summary Judgment (Doc. No. 166, filed Dec. 7, 2008);

16.   Affidavits and Exhibits filed by Palma and Keith Rasmussen in Opposition to the Council's Motion for Summary Judgment (Doc. Nos. 166-2 to -12, filed Dec. 7, 2008); and

17.   Motion of the Council to Strike Palma and Keith Rasmussen's Response in Opposition to the Council's Motion for Summary Judgment (Doc. No. 168, filed Dec. 10, 2008).[1]

## Background

Palma Rasmussen brought this action under Titles I and III of the ADA, 42 U.S.C. §§ 12111-117, 12181-189 (2006), and the Florida Civil Rights Act ("FCRA"), Fla. Stat. §§ 760.01-760.11 (2007), against the Council, alleging that the Council failed to accommodate her disabilities at a camping retreat and then retaliated against her after she complained about the matter. (Doc. No. 7 ¶¶ 5-57, filed Oct. 12, 2007.) The Council filed counterclaims against Mrs. Rasmussen and her husband, Keith Rasmussen, both former Scout Leaders, for an accounting of the finances handled by the Rasmussens and for the alleged conversion of the Council's property. (Doc. No. 17 at 10-17,

---

[1]     The Council moves to strike the Rasmussens' Response to its Motion seeking summary judgment on the accounting claim because the Rasmussens include affidavits and other evidence directed toward the ADA and conversion claims. These submissions are not "pleadings" and therefore cannot be stricken under Federal Rule of Civil Procedure 12(f). *See* Fed. R. Civ. P. 12(f) (allowing the court to strike "pleadings"); *Polite v. Dougherty County Sch. Sys.*, No. 07-14108, 2008 WL 3272131, at *3 n.7 (11th Cir. Aug. 11, 2008) ("Motions to strike are only appropriately addressed towards matters contained in the pleadings."). However, to the extent the Rasmussens have submitted materials directed toward earlier filed summary judgment motions and unrelated to the issues presented in the Council's final Motion for Summary Judgment, such evidence will be disregarded as untimely. (*See* Doc. No. 76, filed Mar. 7, 2008 (disregarding submissions that were filed after the advisement date for a motion for summary judgment).)

filed Nov. 7, 2007.) The Council then moved for summary judgment in its favor on all claims. (Doc. No. 25, filed Dec. 21, 2007.) The Court granted its request in part and denied it in part. (Doc. No. 76.) Currently before the Court are four Motions seeking summary judgment on the various claims which remain in this case.

The general factual background of this case is explained in the Court's previous Summary Judgment Order. (*Id.* at 3-9.) For present purposes, the Court will briefly summarize the issues that were presented and decided in that Order.

## I.    Palma Rasmussen's ADA and FCRA Claims Against the Council

The primary issue before the Court in March of 2008 was whether the Council was subject to liability under Title I, governing employers, and Title III, governing places of public accommodation, of the ADA. (*Id.* at 10-19.) The Council argued that it was exempt from liability because it did not operate places of public accommodation and was a "private club" within the meaning of the Act. (*Id.*)

The Court found that the Council operated places of public accommodation because several of the areas of the particular camp which is the subject of this litigation were included in the statutory definition of places of public accommodation. (*Id.* at 13.) However, the Court also found that the Council was a "private club" within the meaning of the Act because the Boy Scouts have relatively selective membership criteria and were previously found to be a "private club" by the Seventh Circuit Court of Appeals in *Welsh v. Boy Scouts of America.*, 993 F.2d 1267, 1269 (7th Cir. 1993).[2] (Doc. No. 76 at 14-16.) Thus, under the Act, the Council could be liable only to "the extent

---

[2]    The Court's previous order erroneously included a citation to *Welsh* that characterized the case as an Eleventh Circuit decision. (Doc. No. 76 at 12.) To be clear, however,
(continued...)

that [its] facilities . . . are made available to customers or patrons of an establishment within the scope of subsection (b) of this section." (*Id.* at 15 (citing 42 U.S.C. § 2000a(e)).) Section 2000a(b) enumerated several types of "establishments" which existed in the camp. (*See id.*) Of these establishments, a retail store called the "Trading Post" appeared to be open to the general public. (*Id.*) The Court based this conclusion on the affidavit of Mrs. Rasmussen's ADA inspector who stated that he was able to gain access to the store and purchased items there despite having no relation to the Boy Scouts. (*Id.* (citing Doc. No. 46 at 1-2).) Thus, the Court permitted Mrs. Rasmussen to maintain her ADA and FCRA claim based on the alleged non-accessibility of the Trading Post.

In its renewed Motion for Summary Judgment, the Council argues that Mrs. Rasmussen's claims regarding the Trading Post must fail for several reasons. First, the Council contends that Mrs. Rasmussen failed to raise a claim concerning the Trading Post in her Amended Complaint and cannot raise a new claim in response to a summary judgment motion. (Doc. No. 100 at 11-12.) The Council next argues that, despite the representations of Mrs. Rasmussen's ADA expert, the Trading Post is private because it exists in a remote location deep within a camp that was found to be a "private club." (*Id.* at 12-14.) Third, the Council argues that Mrs. Rasmussen lacks standing to bring a claim related to the Trading Post because she suffered no injury-in-fact: her "would have" intention to visit the shop is speculative, she did not know about the alleged barriers to access until after she filed this lawsuit, and she has no plausible basis to return to the camp. (*Id.* at 11-15.)

---

[2](...continued)
the Court was not under the misimpression that *Welsh* was an Eleventh Circuit decision or binding case law. (*See* Doc. No. 76 at 14 n.7 (explaining that the Eleventh Circuit had not yet opined on the proper facts to consider when determining whether an entity is a private club for purposes of Title III).)

Mrs. Rasmussen responds that she raised a claim related to the Trading Post in her Amended Complaint by stating that she wished to avail herself of the "goods and services" available at the camp, and she argues as a practical matter that she could not have known about all of the violations at the 1600 plus acre camp from just one visit.  (Doc. No. 120 at 8-9.)   Mrs. Rasmussen also contends that the Trading Post is open to the public because it has a retail occupational license and the camp is available to the public for rental use and non-Scouting events.  (*Id.* at 9-12.)  Regarding standing, Mrs. Rasmussen explains that she has plans to return to the camp for a non-Scouting related event, she plans to enroll her son to be a Boy Scout, and she plans to file a "complaint" to reinstate her own membership in the Scouts.  (*Id.* at 12.)

Finally, both parties cite to conflicting affidavits of purported experts concerning whether the Trading Post is actually ADA-compliant.[3]  (Doc. No. 100 at 17; Doc. No. 120 at 11.)

## II.    The Council's Request for an Accounting

As Scout leaders, the Rasmussens were entrusted with several bank accounts, and the Council requested an accounting of their handling of these finances.  (Doc. No. 76 at 19-21.)  The particular issue before the Court in March of 2008 was whether the Rasmussens were fiduciaries with respect to the Council's property, and if so, whether an accounting was warranted.  (*Id.* at 20-21.)  The Court determined that the Rasmussens were fiduciaries because they admitted to being in "positions of trust" with respect to Pack 700, Troop 700, and Crew 700 during the relevant time

---

[3]    Mrs. Rasmussen's Motion for Summary Judgment on the ADA claim features arguments similar to her Response to the Council's Motion for Summary Judgment.  The primary difference is that she gives an account in the Motion of her latest trip to the camp in September of 2008, and she also specifies that she will return to the camp again in February of 2009.  (Doc. No. 122 at 6.)  The Council makes arguments in its Response similar to those in its Motion for Summary Judgment.  (Doc. No. 137-2 at 10-19.)

period, and an accounting was warranted because they also admitted to controlling the finances of these groups. (*Id.*) Further, the Rasmussens did not object to the Council's contention that they were fiduciaries and instead offered a one-paragraph explanation of their handling of the finances at issue. (*Id.*)

Several weeks after the Order was issued, the Rasmussens moved for clarification on how the accounting process should occur. (Doc. No. 77, filed Mar. 17, 2008.) The Rasmussens proposed that they should be able to "provide an accounting of their own," and if the Council was not satisfied with the result, it could then direct the Rasmussens to go to a professional accountant at the Council's expense. (*Id.* at 6-7.) The Council opposed this suggestion, contending that the law was clear both that the fiduciary bears the expense of providing an accounting and that Rasmussens would be liable for any ambiguities in their accounting. (Doc. No. 81 at 6-9, filed Mar. 31, 2008.) Thus, it was in the Rasmussens' own interests to employ a professional accountant. (*Id.*)

In response to these arguments, the Court issued an Order giving guidance on the process of accounting. The Court explained that an accounting is a two-step process which places a burden on the defendant, once the duty to account has been established, to prove the non-existence of money allegedly due to the plaintiff. (Doc. No. 86 at 6 (citing *Garcia v. Koch Oil Co. of Tex. Inc.*, 351 F.3d 636, 641 (5th Cir. 2003); *Bynum v. Baggett Transp. Co.*, 228 F.2d 566, 573-74 (5th Cir. 1956);[4] *Beckerman v. Greenbaum*, 439 So. 2d 233, 236 (Fla. 2d DCA 1983)).) Further, the Court explained that the costs of producing the requested accounting are akin to discovery costs, with the party producing the requested material being responsible for the costs of its production. (*Id.* at 6-7.)

---

[4]     The Eleventh Circuit Court of Appeals adopted as binding precedent all prior decisions of the former Fifth Circuit Court of Appeals issued prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

Finally, the Court explained that the "fiduciary's failure to provide an adequate accounting of funds that the plaintiff provided to him results in a presumption that the funds were mishandled." (*Id.* at 7.) Thus, although the Rasmussens were not legally required to use a professional accountant, the failure to adequately account for their use of the funds could result in a judgment against them. (*See id.*)

In its Motion for Summary Judgment on this issue, the Council first argues that the Rasmussens should be liable for the total amount of draw downs on the accounts with which they were entrusted because they provided an inadequate accounting. (Doc. No. 149 at 12-15.) According to the Council, the Rasmussens' accounting consists of nothing more than canceled checks and bank statements with vague annotations beside each draw down and deposit. (*Id.*) Further, the Council was required to issue third party subpoenas to retrieve certain bank statements which the Rasmussens failed to produce. (*Id.* at 6, 14.) The Rasmussens respond that they provided detailed explanations of how and for what purposes they spent the funds. (Doc. No. 166 at 6.) They also argue that none of the parents who reviewed their expenditures during meetings ever objected, and in any event, the Council has no right to the funds. (*Id.* at 8-9.)

In addition, the Council argues that the information contained in the Rasmussens' accounting demonstrates that they used the funds improperly. (Doc. No. 149 at 15-16.) A substantial sum of money was spent on fast food meals and gasoline purchases with little explanation of their legitimacy. (*Id.*) According to the Council, these expenditures were not valid uses of troop funds. (*Id.*) The Rasmussens respond that nothing in the Scout regulations prevent reimbursement for food and fuel. (Doc. No. 166 at 13.) Further, it was necessary to provide food at the meetings to

encourage parents and children to attend. (*Id.*) The Rasmussens also explain that the overdraft fees were "self explanatory" and did not accrue to their benefit. (*Id.* at 14.)

## III. Conversion

The final issue discussed in the Court's March of 2008 Order was the Council's claim for conversion. (Doc. No. 76 at 21-22.) The Council had argued that the Rasmussens retained some of the Troop 700, Pack 700, and Crew 700's equipment after the groups' respective charters expired. (*Id.*) Boy Scouts of America rules and regulations state that "property acquired by Scouting units shall be deemed to be received or acquired solely for the benefit of Scouting as interpreted and promoted by the Boy Scouts of America." (*Id.*) Further, when a unit's charter expires, any property held by the unit "shall be held in trust by the chartering organization or the chartered local council, as may be agreed upon, pending reorganization of the unit or for the promotion of the program of the Boy Scouts of America." (*Id.*) As a result, the Council urged, the Rasmussens were liable under a theory of conversion for any property they retained. (*Id.*) In response, the Rasmussens argued that they had transferred the subject property to a independent "Parents' Association" ("PA") in 2006, well before the charters expired. (*Id.*) The Court found that a genuine issue of material fact existed as to whether this transfer was effective; therefore, summary judgment could not be granted. (*Id.*)

The Council now argues that it is entitled to summary judgment on this matter because the only relevant agreement between the parties is the Rasmussens' agreement to abide by Scouting regulations. (Doc. No. 100 at 17.) Since Scouting regulations state that property is "deemed to be received or acquired solely for the benefit of Scouting" and such property is to be held in trust by the chartering organization upon the expiration of a unit's charter, the Rasmussens lacked authority to transfer the property to the PA. (*Id.* at 18-19.) Further, the PA's charter does not reflect the

transfer of property, and the signatories to the document do not recall a separate agreement to make such a transfer. (*Id.* at 19.) Morever, the Rasmussens did not actually take possession of the property until over a year after the PA was formed. (*Id.*)

The Rasmussens respond that on September 5, 2006, the "adult members of the Pack" voted to form the association that would take possession of the property. (Doc. No. 120 at 14.) Further, the Rasmussens argue that they cannot be liable for conversion because they believed that all of the property in dispute was lawfully possessed by the PA. (*Id.* at 16.) They also claim that they do not possess the property at issue and never did. (*Id.* at 18.) Finally, the Rasmussens contend that much of the property is incorrectly valued, certain items do not exist, certain items are owned by the Rasmussens individually, and some items were given directly to the PA. (*Id.* at 12-13.)

## Standard of Review

## I. Subject Matter Jurisdiction

Subject matter jurisdiction must be affirmatively shown in the record before the Court may consider the merits of any case. *E.g.*, *Sweet Pea Marine, Ltd. v. APJ Marine, Inc.*, 411 F.3d 1242, 1247 (11th Cir. 2005). As a general matter, the party asserting federal subject matter jurisdiction bears the burden of proving its existence. *Id.* When standing to sue is at issue, the weight of the plaintiff's burden to establish standing is commensurate with the stage of litigation. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). At the summary judgment stage, the plaintiff must demonstrate that genuine issues of material fact exist with respect to the facts necessary to establish standing. *Id.*; *CAMP Legal Defense Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1269-70 (11th Cir. 2006). Thus, the plaintiff cannot rest on "'mere allegations,' but must 'set forth' by affidavit or

other evidence 'specific facts,' Fed. Rule Civ. Proc. 56(e), which for purposes of the summary judgment motion will be taken to be true." *Lujan*, 504 U.S. at 561.

## II.     Summary Judgment

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1259 (11th Cir. 2004). An issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case. *Hickson Corp.*, 357 F.3d at 1259. An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. *Id.* at 1260. A court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.*; *Anderson*, 477 U.S. at 251-52.

The party moving for summary judgment has the burden of proving that: (1) there is no genuine issue as to any material fact, and (2) it is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in the light most favorable to the party opposing the motion and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255. The court may not weigh conflicting evidence or weigh the credibility of the parties. *Hairston v. Gainesville Sun Publ'g. Co.*, 9 F.3d 913, 919 (11th Cir. 1993). If a reasonable fact finder could draw more than one inference from the facts and that inference creates an issue of material fact, a court must not grant summary judgment. *Id.* On the other hand,

summary judgment must be granted "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

## Analysis

### I.     Mrs. Rasmussen's ADA and FCRA Claims

The Council makes five arguments for summary judgment in its favor on Mrs. Rasmussen's public accommodation claims, two of which concern the issue of constitutional standing and therefore this Court's subject matter jurisdiction to hear the claim.[5]  Accordingly, the Court will consider these arguments first. *E.g.*, *Sweet Pea Marine, Ltd.*, 411 F.3d at 1247 (subject matter jurisdiction must be affirmatively shown in the record before considering the merits of any case).

As a general matter, a federal court has the power to hear only those cases over which it has been granted subject matter jurisdiction by Article III, Section 2 of the United States Constitution. Article III provides that the judicial power extends over "cases" and "controversies."  U.S. Const. Art. III, § 2; *Lujan*, 504 U.S. at 559-60. The United States Supreme Court has interpreted this language as requiring, among other things, that the parties bringing suit in federal court have standing to do so. *Id.* at 560.  Specifically, the Court has explained that:

> [T]he irreducible constitutional minimum of standing contains three elements.  First, the plaintiff must have suffered an "injury in fact"—an invasion of a legally protected interest which is (a) concrete and particularized . . . ; and (b) "actual or imminent, not 'conjectural' or 'hypothetical,'" . . . .  Second, there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e]

---

[5]      The Council argues that Mrs. Rasmussen has failed to demonstrate an injury-in-fact with respect to the Trading Post specifically and a future injury with respect to the camp generally. (Doc. No. 100 at 14-17.)  The Court will consider jointly these two arguments in the following analysis because both concern the issue of standing.

result [of] the independent action of some third party not before the court." . . . Third, it must be "likely," as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

*Id.* at 560-61 (internal citations and footnote omitted). At issue here is the first of these elements: whether Mrs. Rasmussen suffered an "injury-in-fact" with respect to the Trading Post.

### A.    Standing for Mrs. Rasmussen's ADA Claim

The application of the "injury-in-fact" requirement in public accommodations cases is shaped by Congress' selection of injunctive relief as Title III's sole remedy. 42 U.S.C. § 2000a-3(a). The Eleventh Circuit has explained that "[b]ecause injunctions regulate future conduct, a party has standing to seek injunctive relief only if the party alleges . . . a real and immediate—as opposed to a merely conjectural or hypothetical—threat of future injury." *Shotz v. Cates*, 256 F.3d 1077, 1081 (11th Cir. 2001) (citing *Wooden v. Bd. of Regents of Univ. Sys. of Ga.*, 247 F.3d 1262, 1284 (11th Cir. 2001)). As a result, the question of whether the plaintiff has constitutional standing to pursue a Title III claim depends on whether the plaintiff is likely to return to the defendant's place of public accommodation in the immediate future. *Id.* (disabled plaintiff unlikely to return to a courthouse because he was initially there to respond to criminal charges and did not allege any future plans to return); *Access for Am. v. Assoc. Out-Door Clubs, Inc.*, 188 F. App'x 818, 818 (11th Cir. 2006) (disabled plaintiff unlikely to return to race track because he did not demonstrate a concrete and specific intent to return); *Rosenkrantz v. Markopoulos*, 254 F. Supp. 2d 1250, 1253 (M.D. Fla. 2003) (disabled plaintiff unlikely to return to a hotel in Clearwater Beach because he lived in south Florida, he left the region to travel to North Carolina only twice per year, and the most direct route would not go through the Tampa area). Courts consider such factors as the plaintiff's proximity to the

facility, the plaintiff's past use of the facility, and the certainty and sincerity of the plaintiff's intent to visit the facility in the future. *Rosenkrantz*, 254 F. Supp. 2d at 1253.

Regarding the scope of the inquiry, standing must be established by facts existing at the time the complaint is filed. *Lujan*, 504 U.S. at 571 n.4. Further, the Eleventh Circuit has warned that district courts must not embellish their own jurisdiction by "speculat[ing] concerning the existence of standing or piec[ing] together support for the plaintiff.'" *Shotz*, 256 F.3d at 1081 (citing *Cone Corp. v. Fla. Dept. of Transp.*, 921 F.2d 1190, 1210 (11th Cir. 1991)). Thus, the plaintiff must set forth the facts that create standing. *See id.*

The Council argues that Mrs. Rasmussen cannot identify a concrete and particularized injury-in-fact in this case. Particularly, she never attempted to visit the Trading Post, and because neither she nor any member of her family is currently involved with the Scouts, she lacks any plausible plans to return to the camp. (Doc. No. 100 at 14-16.) Mrs. Rasmussen responds that she could not have possibly known about all of the camp's ADA violations from one trip. (Doc. No. 120 at 8-9.) Further, she avers that she has already attempted to return to the camp to visit the Trading Post in September of 2008, and she plans to visit it again in the future when her son becomes a Boy Scout. (*Id.* at 6, 11-12.)

As discussed above, whether a plaintiff has standing is determined by the facts in existence at the time the plaintiff files his or her complaint; consequently, standing can neither be created nor destroyed by developments during litigation. *E.g., Resnick v. Magical Cruise Co., Ltd.*, 148 F. Supp. 2d 1298, 1302 n.2 (M.D. Fla. 2001). Thus, the Council's arguments regarding Mrs. Rasmussen's expulsion from the Boy Scouts, as well as Mrs. Rasmussen's arguments regarding her attempted visit to the camp in August of 2008 and plans to sign her son up for the Boy Scouts, are not

determinative because these events occurred well after this suit was filed. Rather, this Court must limit its inquiry to the experiences and plans Mrs. Rasmussen had contemporaneous with the filing of this suit.

Further, before proceeding to this analysis, it must be emphasized that the focus of the standing issue is whether Mrs. Rasmussen was likely to visit the Trading Post at the time she filed this suit. Mrs. Rasmussen filed a complaint alleging ADA violations throughout the camp; however, the Court later found that all but one facility within the camp, the Trading Post, was part of a "private club" as a matter of law. In doing so, the Court significantly narrowed Mrs. Rasmussen's claim, and the Court must now determine whether she has standing with respect to that narrower claim. *See Parker v. Scrap Metal Processors, Inc.*, 386 F.3d 993, 1002-03 (11th Cir. 2004) ("[S]tanding must exist with respect to each claim.").

Given the temporal and geographical restrictions on the Court's analysis, the issue of whether Mrs. Rasmussen suffered an Article III injury at the time she filed this suit is somewhat difficult. Though Mrs. Rasmussen is not currently a member of the Boy Scouts, (Doc. No. 110 ¶ 11), she was a member at the time she filed this suit, and she had gone to the camp for Scouting-related events, (*e.g.*, Doc. No. 44 ¶ 14). Thus, in contrast to cases such as *Lujan* and *Rosenkrantz*, where the plaintiffs were geographically far from the place of the claimed injury and demonstrated little chance of returning, at the time Mrs. Rasmussen filed the Complaint she appeared likely to return to the camp for a Scouting event at some point in the future. At the same time, however, there is no indication in Mrs. Rasmussen's affidavits whether, at the time she filed this case, she had concrete plans to return to the camp on a particular date or within a particular time frame. *Access for Am.*, 188 F. App'x at 818.

The record is even less clear regarding Mrs. Rasmussen's likelihood of visiting the Trading Post specifically. The evidence she has submitted contains only a handful of statements that are related to her future intention of visiting the Trading Post at the time she filed the Complaint. Specifically, Mrs. Rasmussen acknowledges in her first affidavit, filed in January of 2008, that she did not visit the Trading Post, but she "would have taken an opportunity to go" and "would have greatly enjoyed a visit to the [Trading Post]" during her pre-litigation visits. (Doc. No. 44 ¶¶ 14, 26.) However, she did not go because it was "not accessible."[6] (*Id.*)

In its July of 2008 Motion for Summary Judgment, the Council cites to several affidavits from people who interacted with Mrs. Rasmussen at the camp during her visit, all of whom attest that she never mentioned the Trading Post during the weekend. (Doc. No. 104 ¶¶ 4-5; Doc. No. 105 ¶ 5; Doc. No. 106 ¶ 3; Doc. No. 107 ¶ 3; Doc. No. 108 ¶ 3; Doc. No. 109 ¶ 2.) In response to these affidavits, Mrs. Rasmussen states that she told her husband, while driving to camp for Ordeal Weekend, that she planned to visit the Trading Post. (Doc. No. 120-2 ¶ 32; 122-2 ¶ 32.) She then clarifies:

> The only reason I did not mention wanting to go to the Trading Post/Scout Shop to anyone at Camp La-No-Che during the Ordeal Weekend was due to the fact that on my arrival, I discovered that the arrangements that had supposedly been made for me had not been done[,] and the continued downward spiral of my treatment while at the Camp ([s]uch as not being able to use a bathroom or having access to my wheelchair for more than 24 hours) became a more pressing issue than getting to the Trading Post/Scout Shop.

(Doc. No. 120-2 ¶ 33; Doc. No. 122-2 ¶ 33.)

---

[6]     Mrs. Rasmussen does not explain how she knew the Trading Post was unaccessible. In a later affidavit, she states that she learned of the store's inaccessibility during a trip to the camp in 2004, though she does not specify whether she actually visited the store. (Doc. No. 122-2 ¶ 72.)

From this evidence, the Court gleans two pertinent facts: (1) Mrs. Rasmussen did not attempt to visit the Trading Post during the Ordeal Weekend; and (2) the only evidence of her pre-litigation intent to access the store in the future is that she had initially planned to visit it while driving to camp but later abandoned her plans due to more pressing matters. Under the case law, these facts are insufficient to confer standing. The fact that Mrs. Rasmussen did not visit the Trading Post prevents the Court from inferring the likelihood of future visits from past visits. *See Access for Am., Inc.*, 188 F. App'x at 820 (Barkett, J., dissenting) (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 102 (1983); arguing that the majority should have inferred the plaintiff's intent to visit a race track from his past visits). Further, Mrs. Rasmussen's statement concerning her desire to visit the Trading Post is strikingly similar to the "speculative" language that the Supreme Court criticized in *Lujan*. *See Lujan*, 504 U.S. at 563 (the plaintiffs had previously observed Nile crocodiles and "hope[d]" and "intend[ed]" to do so again); *see also Access for Am., Inc.*, 188 F. App'x at 819 (Barkett, J., dissenting) (contrasting the plaintiff's desire to visit the race track at some point in the next year with the speculative nature of the *Lujan* plaintiffs' affidavits). In sum, there is simply no indication that Mrs. Rasmussen had a contemporaneous intent to visit the Trading Post in the "imminent" or "immediate" future when she filed this lawsuit.[7] *Lujan*, 504 U.S. at 561.

---

[7] Both Mrs. Rasmsussen's visit to the camp in September of 2008 and her current professed desire to visit the Trading Post in February of 2009 are unavailing. (*See* Doc. No. 122-2 ¶ 34 (stating that she will shop at the Trading Post on February 27, 2009, during her son's Boy Scout event).) There is no evidence whatsoever that her visit to the camp in September of 2008 was planned at the time she filed this suit. Further, her February of 2009 plans first appeared in her third affidavit submitted during the litigation. Mrs. Rasmussen does not indicate that she had made the plan when she first filed the lawsuit approximately one year earlier, and there is no way to reasonably infer such an intent from her statement. In fact, Mrs. Rasmussen states that her son became a Boy Scout on September 2, 2008. (*Id.* ¶80.) His application was filled out in August of 2008. (Doc. No. 120-2 at 80.)

Also significant is the omission of the Trading Post from the Amended Complaint's list of specific areas of the camp containing alleged ADA violations. Mrs. Rasmussen explains in her Amended Complaint that: "The discriminatory violations described in paragraphs 12 and 40 are not an exclusive list of Defendant's ADA violations. The Plaintiff requires an inspection of the Defendant's place of public accommodation in order to determine all of the discriminatory acts violating the ADA." (Doc. No. 7 ¶ 45.) Mrs. Rasmussen later clarifies in her Response to the Council's Motion for Summary Judgment that "[a] person such as [Mrs. Rasmussen] cannot be expected to find all the ADA violations on a 1600+ acre camp." (Doc. No. 120 at 8; Doc. No. 122 at 7.) While the size of the camp makes it understandable as a practical matter why Mrs. Rasmussen was unable to find the alleged violations at the Trading Post during her pre-litigation visits, this explanation further undermines her case for standing with respect to the store. If Mrs. Rasmussen had a serious intention of visiting the Trading Post in the future, and she believed that she would suffer an injury due to the Trading Post's alleged ADA violations, one would expect the store to be listed among the specific camp facilities mentioned in her Amended Complaint rather than relegated to the category of unknown violations that will later be discovered. Thus, the failure to mention the Trading Post in the Amended Complaint is probative of a lack of intent to visit the store in the future.[8]

_____

[8] As a related matter, there is a body of case law cited by the Council concerning the need for a plaintiff to encounter, or to be aware of, actual barriers to access before bringing a public accommodations claim. (Doc. No. 100 at 15-17.) Under the ADA, suit may be brought by "any person who is being subjected to discrimination on the basis of disability in violation of this subchapter or who has reasonable grounds for believing that such person is about to be subjected to discrimination . . . ." 42 U.S.C. § 12188(a)(1). The statute further provides, "Nothing in this section shall require a person with a disability to engage in a futile gesture if such person has actual notice that a person or organization covered by this subchapter does not intend to comply with its
(continued...)

Accordingly, the Court finds that no genuine issues of material fact exist regarding Mrs. Rasmussen's likelihood of visiting the Trading Post at the time she filed this suit because she did not previously visit the store and she has not produced any evidence of a contemporaneous intention to visit the Trading Post at the time this suit was filed. *Lujan*, 504 U.S. at 561 (explaining that the factual burden to demonstrate standing is commensurate with the stage of litigation in which the defendant brings its challenge to jurisdiction; in the summary judgment stage, the plaintiff must demonstrate a genuine issue of material fact with respect to the relevant factual issues). In reaching this conclusion, the Court is particularly mindful of the Eleventh Circuit's warning not to embellish subject matter jurisdiction. Finding the existence of an injury-in-fact with respect to the Trading Post would quite literally require the Court to "speculate" and "piece together support for the plaintiff." *Shotz*, 256 F.3d at 1081.

**B.      Mrs. Rasmussen's FCRA Claim**

The FCRA permits an award of compensatory and punitive damages in addition to the issuance of an injunction. Fla. Stat. §§ 760.07, 760.11(5). To the extent Mrs. Rasmussen seeks an injunction under the Act, she lacks standing for the reasons stated above.

---

[8](...continued)
provisions." *Id.* Construing this language, courts have required the plaintiff to attempt entry into the allegedly non-accessible area *or* have actual notice through personal experience or expert findings that the area is not compliant with the ADA. *Resnick*, 148 F. Supp. 2d at 1302 n.2 (finding that a wheelchair-bound ADA plaintiff lacked standing to sue a cruise ship company over alleged ADA violations on its ships because the plaintiff never attempted to board the ship and gathered his knowledge of the violations by examining the company's website). However, the Court need not address this separate, statutory issue because Mrs. Rasmussen lacks Article III standing to bring a claim related to the Trading Post. *See Access 4 All, Inc. v. Chicago Grande, Inc.*, No. 06 C 5250, 2007 WL 1438167, at *4 (N.D. Ill. May 10, 2007) (explaining that the statutory requirements of section 12188(a)(1) are separate and distinct from Article III standing).

Mrs. Rasmussen also lacks standing to seek damages. Standing to pursue a claim for money damages must be based on a past injury. *Connecticut v. Health Net, Inc.*, 383 F.3d 1258, 1262 (11th Cir. 2004). Mrs. Rasmussen concedes that she did not attempt to access the Trading Post during the Ordeal Weekend,[9] (*e.g.,* Doc. No. 120-2 ¶ 16.), and she does not plead in her Amended Complaint the occurrence of any other incident with respect to the Trading Post that would constitute a past injury, (*see* Doc. No. 7). Thus, she has not suffered an injury-in-fact with respect to the Trading Post for which she could be compensated under the FCRA. Accordingly, she lacks standing to pursue a claim for damages. *Health Net, Inc.*, 383 F.3d at 1262.

## II. The Council's Claim for an Accounting

The Court previously granted summary judgment on the Council's request to order the Rasmussens to perform an accounting. (Doc. No. 76 at 19-21.) In a separate Order, the Court also provided guidance on the mechanics of the accounting process and an explanation of the consequences of providing an inadequate accounting. (Doc. No. 86.) The Council now argues that it is entitled to summary judgment on the entire amount the Rasmussens spent during their tenure as troop leaders because their accounting was inadequate. (Doc. No. 149 at 12-15.) The Council also contends that certain expenses claimed by the Rasmussens were inappropriate. (*Id.* at 15-16.)

---

[9] Mrs. Rasmussen states that she "knew" from a previous trip to the camp in 2004 that the Trading Post was not ADA-compliant. (Doc. No. 122-2 ¶ 72.) However, Mrs. Rasmussen's 2004 trip to the camp is not mentioned in her Amended Complaint and appears to be outside the scope of her claim. Thus, even assuming that Mrs. Rasmussen attempted to access the Trading Post in 2004 and was rebuffed by its non-accessibility, awarding damages for this incident would be akin to awarding damages for a cause of action not set forth in the plaintiff's complaint.

## A.      Adequacy of the Accounting

The case law is relatively clear that the burden rests on the fiduciary-defendants, here the Rasmussens, to adequately account for their use of the beneficiary-plaintiff's funds. *E.g.*, *Smith v. Am. Motor Inns of Fla.*, 538 F.2d 1090, 1092 (5th Cir. 1976) (construing Florida law); *Beckerman v. Greenbaum*, 439 So. 2d 233, 236 (Fla. 2d DCA 1983). Under Florida law, ambiguities in the accounting result in a presumption that the fiduciary mishandled the beneficiary's funds.[10] *Traub v. Traub*, 135 So. 2d 243, 244 (Fla. 2d DCA 1961); *see also* Joel Eichengrun, *Remedying the Remedy of Accounting*, 60 Ind. L. J. 463, 470 (1985). Unfortunately, however, the case law does not describe exactly what constitutes an "ambiguous" accounting. In the only Florida case law on point, *Traub*, 135 So. 2d at 244, the fiduciary's records were destroyed by a hurricane, and his vague testimony at trial regarding the use of funds, with the lack of documentary verification, failed to meet his burden of proof. The court's finding of liability appeared to rest primarily on the fiduciary's inability to separate expenses related to a construction project for the beneficiary from expenses related to the fiduciary's own project. *See id.* ("Further uncertainties as to these items are shown in the record by virtue of the fact that the appellant owned in his own name and right property adjoining the trust property and there was no distinct testimony as to what expenditures or services applied to each.").

---

[10]      The claim for an accounting appears to be brought under state law, (*see* Doc. No. 17 at 10), and is thus controlled by Florida law. *Smith*, 538 F.2d at 1091-92. However, apparently recognizing the scarcity of reported Florida decisions regarding the process of accounting, both parties cite to cases construing other sources of law. (*E.g.*, Doc. No. 149 at 12; Doc. No. 166 at 8.) The Court will do the same here, albeit with the recognition that Florida law is controlling, and these cases can serve only as persuasive authority.

At least one case from the Eighth Circuit specifies that a party making an accounting should "present an itemized statement, showing the details of expenditures, with the vouchers, receipts, and memoranda supporting [the] claim." *Wooton Land & Fuel Co. v. Ownby*, 265 F. 91, 99 (8th Cir. 1920). Further, as a practical matter, the commonly understood meaning of the term "accounting" envisions some sort of detailed ledger or itemized statement. *E.g.*, Black's Law Dictionary 18 (8th ed. 2004) (defining "accounting" as "[a] detailed statement of the debts and credits between parties to a contract or to a fiduciary relationship"); Webster's II New Riverside Dictionary 74 (1994) (defining "accounting" as the "[t]he bookkeeping methods involved in making a financial record of business transactions and in the preparation of statements concerning the assets, liabilities, and operating results of a business"). However, there does not appear to be any binding case law explicitly requiring the fiduciary to produce such documents in an action for an accounting. Rather, as described above, the legal sufficiency of an accounting appears to be judged by its ability to guide the court in determining how the fiduciary handled the entrusted funds. *See Traub*, 135 So. 2d at 244 ("The burden of proof is upon him to show that the money expended was a proper disbursement."); Eichengrun, *supra*, at 470 ("It will be presumed that funds or property unaccounted for were misappropriated, and expenses unexplained were not incurred, with all inferences resolved against the defendant on these issues.").

The Court agrees that the Rasmussens did not provide a "real" accounting, as the Council argues, but it does not accept the Council's blanket statement that every single annotation the Rasmussens provided was so ambiguous as to warrant judgment as a matter of law on the entire sum of draw downs, $89,132.18 by the Council's estimate. (*See* Doc. No. 149 at 4, 12-15.) The annotations in the several hundred pages of statements and cancelled checks provided by

Rasmussens account range from fairly straightforward explanations, such as "website hosting fees," (Doc. No. 150-5 at 8), to the somewhat bizarre and cryptic, such as "eggrolls for picky eaters," (Doc. No. 150-6 at 35). In its Motion for Summary Judgment, the Council points to several ambiguous entries, such as the "drinks for B&G setup team," "gift basket," and "fuel for unit errands," but does not specify the remainder of the entries which it deems ambiguous. (Doc. No. 149 at 14.)

Although the Rasmussens bear both the burden of production and persuasion to demonstrate the legitimacy of their expenditures, the Council, as the party moving for summary judgment, must demonstrate that no genuine issue of material fact exists with respect to claims on which it seeks summary judgment. *Celotex Corp.*, 477 U.S. at 323. The Council is seeking summary judgment on the entire sum of expenditures on the basis that all are ambiguous, but the Court's review of these documents reveals that at least some of the entries are actually unambiguous. Consequently, a genuine issue of material fact exists with respect to the ambiguity of the broad category of annotations identified by the Council, and the Court will not grant summary judgment for the *entire sum* of draw downs.[11]

### B.     The Legitimacy of Claimed Expenses

The Council also requests summary judgment with respect to certain expenses that the Rasmussens claim. Particularly, the Council argues that Boy Scouts policy did not authorize the

---

[11]     The Rasmussens, who carry the burden to prove the legitimacy of each expense, will be required at trial to explain each response and how each constitutes a legitimate expense. At this point, the Council will not be required to demonstrate the ambiguity of each expense. *See Traub*, 135 So. 2d at 244. Preferably, expenses should be categorized to promote efficiency and prevent the overlap of explanations. It should be emphasized that the Court will not *sua sponte* wade through several hundred pages of bank statements and canceled checks to identify unambiguous entries for the Rasmussens' benefit.

Rasmussens' expenditures for fuel and food. (Doc. No. 149 at 15-16.) The Council cites to a document called "Unit Budget Plan: Boys, Basics, and Budgets" which states in a paragraph entitled "Activities" that "as a special note, refreshments at parties or parents' meetings can be homemade or met by a cover charge or 'kitty' at the event. Regular unit funds should not be used for this purpose." (Doc. No. 151-2 at 1.) Kevin Litt, the Field Director for the Council, attests that it "is against Scout policy to use these funds to reimburse adults for expenses associated with attending meetings, going on errands, or performing other types of activities that they are intended to donate as a part of participating in Scouting." (Doc. No. 151 ¶ 2.) In addition, the Council cites to several affidavits of parents who do not recall the Rasmussens providing food at meetings or holding parents' meetings at restaurants. (Doc. No. 152 ¶¶ 3-7; Doc. No. 153 ¶¶ 3-7; Doc. No. 154 ¶¶ 2-6.) The Rasmussens respond that Boy Scouts policy does not prohibit expenditures for food or reimbursement for fuel. (Doc. No. 166-2 ¶¶ 13, 26, 27.) They also contend that they provided food at various meetings to encourage attendance. (*Id.* ¶ 17.)

The ultimate purpose of an accounting in a circumstance like this is to determine whether the fiduciary breached his or her duty to the beneficiary. *See Traub*, 135 So. 2d at 244 ("The burden of proof is upon him to show that the money expended was a proper disbursement." (quoting *Benbow v. Benbow*, 157 So. 512, 519 (Fla. 1934))). The Restatement (Third) of Agency generally describes the fiduciary principle as a "duty to act loyally for the principal's benefit in all matters connected with the agency relationship."[12] Restatement (Third) of Agency § 8.01 (2006). In this

---

[12] The Court was unable to find, nor have the parties presented, any Florida case law giving specific guidance on how to evaluate a fiduciary's handling of an entrusted bank account where the fiduciary is not a trustee. Nevertheless, the Court notes that Florida courts generally turn to the Restatements, particularly the Restatements on agency law, for guidance on such issues. *E.g.*, (continued...)

case, the Court previously found that the Rasmussens assumed a fiduciary duty with respect to their control of the Troop 700, Pack 700, and Crew 700 bank accounts. (Doc. No. 76 at 19-21.) Thus, the Court's discussion of the Rasmussens' fiduciary duties will be limited to their control and use these finances.[13]

Regarding the use of entrusted property, the Restatement (Third) explains that the agent has a specific duty "not to use property of the principal for the agent's own purposes or those of a third party." Restatement (Third) of Agency § 8.05. However, comment a to this section clarifies that "the principal may consent to action by an agent that would otherwise contravene the agent's duties."[14] Likewise, The Restatement (Third) explains as a general matter that agent "has a duty to act in accordance with the express and implied terms of any contract between the agent and the principal." *Id.* § 8.07. For purposes of these provisions, an "agreement" can include express contractual terms, implied contractual terms, and the custom of a trade. *Id.* cmt. b.

Based on the above principles, the Court finds that a genuine issue of material fact exists with respect to whether the Rasmussens' expenditures on food and fuel are generally consistent with

---

[12](...continued)
*Goldchmidt v. Holman*, 571 So. 2d 422, 424 n.5 (Fla. 1990); *Palafrugell Holdings, Inc. v. Cassel*, 940 So. 2d 492, 494 (Fla. 3d DCA 2006); *Gillet v. Watchtower Bible & Tract Soc. of Penn., Inc.*, 913 So. 2d 618, 623 (Fla. 3d DCA 2005). The Court will do the same here.

[13]     The Rasmussens argue as a general matter that the bank accounts do not belong to the Council. (Doc. No. 166 at 9.) This issue has already been decided in the Council's favor and will not be revisited here. (*See* Doc. No. 76 at 19-21.) Further, they offer no legal authority in support of this point.

[14]     Section 8.12 of the Restatement (Third) of Agency explains that the agent also has a duty, "subject to any agreement with the principal, (1) not to deal with the principal's property so that it appears to be the agent's property; (2) not to mingle the principal's property with anyone else's; and (3) to keep and render accounts to the principal of money or other property received or paid out on the principal's account."

their fiduciary duties. As an initial matter, the Court does not agree with the Council that the instruction in the Unit Budget Plan document that "[r]egular unit funds should not be used [to provide refreshments at meetings]" is a controlling contractual term that invalidates the Rasmussens' expenditures as a matter of law. The document is informally worded and does not contain any language suggesting that it should be interpreted as a mandatory guideline.[15] Furthermore, the use of the word "should" can be interpreted as permissive, in contrast to clear mandatory language such as "must." At most, this document is probative of the understanding between the parties and how Scout leaders customarily spend unit funds.

Further, the parties present conflicting affidavits concerning whether the use of Scout funds for food and fuel for errands is consistent with Scouting policy and custom. (*Compare* Doc. No. 151 ¶ 2 (Kevin Litt stating that such expenditures are inconsistent with Scouting policy), *with* Doc. No. 166-2 ¶¶ 13, 26, 27 (Palma Rasmussen stating that Kevin Litt told her to use Scout funds to offset

---

[15] Rather, the document appears to be a resource for helping Scout leaders develop a budget. For instance, the opening paragraphs of the document state:

> Take first things first. If your job is the management of money, your firsts are basics: basic income, basic spending, basic needs. Attend to them first.

> If your job is the management of money for a Cub Scout pack, Boy Scout troop, or Varsity Scout team, your basics still come first, and they are the same whether the unit be in Hawaii or Maine. They should be planned and budgeted FIRST. Once you develop a sound budgeting plan for basics, you can add other things such as your individual programming or equipment needs.

> The total is a well managed, well financed unit. Recognizing this, the Boy Scouts of America recommends a basic unit budget plan, including 10 parts divided into three categories; basic expenses, other expenses, and sources of income.

(Doc. No. 151-2 at 1.) Markedly absent is any language requiring conformance to the document's suggestions.

her expenses, that the adult members of the Troop and Crew approved all the expenditures, and that feeding the members of the Pack, Troop, and Crew was consistent with the mission of the Scouts to help those in need).)   They also present conflicting affidavits whether the food which was purchased with the units' funds was actually given to the members of the units.  (*Compare* Doc. No. 152 ¶¶ 3-7, Doc. No. 153 ¶¶ 3-7, *and* Doc. No. 154 ¶¶ 2-6, *with* Doc. No. 166-2 ¶ 27.)  While the Council emphasizes the various contradictions, inconsistences, and implausible claims in the Rasmussens' affidavits, the Court cannot resolve credibility determinations at the summary judgment stage, even if lack of credibility in some instances is fairly obvious.[16]  In other words, the Rasmussens have presented sworn testimony in support of the two salient factual issues: (1) that their claimed use of the funds is consistent with Scouting policy; and (2) that they actually spent the funds as they claim.

Accordingly, genuine issues of material fact exist with respect to whether the Rasmussens' expenditures were consistent with their fiduciary duties, and the Court will deny summary judgment on this claim. [17]

---

[16]   An example is the Rasmussens' initial claim that they purchased the materials for a shed on their property at a yard sale with their own funds.  (Doc. No. 120 at 14; Doc. No. 120-2 ¶ 24.)  During its review of the Rasmussens' accounting, the Council discovered that materials for the shed were purchased with unit funds.  (*See* Doc. No. 149 at 11.)  Mrs. Rasmussen then claimed that unit funds were used to purchase the floor platform but not to purchase the shed itself. (Doc. No. 144-2 ¶ 7.)

[17]   The Rasmussens provided no explanation for their incurring of overdraft fees except to state that such fees did not accrue to their benefit.  (Doc. No. 166-2 ¶ 19.)  A fiduciary's liability does not depend on whether mistakes accrued to his or her benefit.  *E.g.*, Restatement (Third) of Agency § 8.08 (fiduciaries have a duty of care beyond their duty of loyalty).  Nevertheless, the Council does not appear to move for summary judgment with respect to the fees specifically, so the Court will not determine whether the Rasmussens have raised a genuine issue of material fact regarding their liability for the fees.

### III.    Conversion

Both the Council and the Rasmussens move for summary judgment on the Council's conversion claim.  The Council's primary argument is that the Rasmussens agreed to abide by Boy Scout bylaws when they applied to become adult leaders.  (Doc. No. 100 at 17-18.)  Since Scout regulations state that property is "deemed to be received or acquired solely for the benefit of Scouting" and such property is to be held in trust by the chartering organization upon the expiration of a charter, the Rasmussens lacked authority to transfer the property to the PA.  (*Id.*)  Therefore, the Council has greater rights to the property.  (*Id.*)  Further, the Council claims that the PA's charter says nothing about transferring property, and the two other signatories to the charter, Mike Bross and Mary Kofil, do not recall an agreement to transfer property to the PA.  (*Id.* at 19-20.)  In addition, the property remained on the grounds of the chartering organization, the Good Shepard Lutheran Church, and the Rasmussens did not actually take possession of the property until the units' charters expired.  (*Id.* at 21.)  Finally, the Council argues that the Rasmussens offer inconsistent explanations regarding the ownership and current whereabouts of the disputed property. (Doc. No. 137-2 at 5-10.)       The Rasmussens respond that they cannot be liable for conversion because they believed that all of the property in dispute was lawfully possessed by the PA.  (Doc. No. 120 at 16.)  Further, on September 5, 2006, the "adult members of the Pack, Troop[,] and Crew 700 Committee including Mike Bross voted to form [the association] that would accept ownership and take possession" of the property.  (*Id.* at 14.)  The Rasmussens also argue that the Council failed to demand the return of the contested property.  (*Id.* at 17.)  In addition, the Rasmussens contend that the PA, as opposed to the Rasmussens individually, possesses the property.  (*Id.*)   Finally, the Rasmussens claim that much of the property is incorrectly valued, certain items do not exist, certain

items are owned by the Rasmussens individually, and some items were given directly to the PA. (*Id.* at 12.)

Florida law treats the tort of conversion as "an unauthorized act which deprives another of his property, permanently or for an indefinite time." *Furmanite Am. Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1134, 1143 (M.D. Fla. 2007); *see also Senfeld v. Bank of Nova Scotia Trust Co. (Cayman) Ltd.*, 450 So. 2d 1157, 1160-61 (Fla. 3d DCA 1984). Conversion may be established by the demand of a party with rights to the property and the refusal of the party in possession to return the property. *Senfeld*, 450 So. 2d at 1161; Restatement (Second) of Torts § 237 (1965). However, proof of demand and refusal is unnecessary where the "conversion can otherwise be shown." *Senfeld*, 450 So. 2d at 1161. In sum, "the essence of conversion is not the possession of property by the wrongdoer, but rather such possession in conjunction with a present intent on the part of the wrongdoer to deprive the person entitled to possess of the property, which intent may be, but is not always, shown by demand and refusal." *Id.*

Neither the Rasmussens nor the Council offer convincing arguments for summary judgment. The arguments advanced by the Council are similar to those advanced the first time it moved for summary judgment, and they are no more persuasive now. There is no dispute that the Rasmussens agreed to abide by the Boy Scouts bylaws. (*See* Doc. No. 117-2 (Palma and Keith Rasmussen's applications to be adult leaders).) But the regulation on which the Council relies, that all property acquired by a unit "shall be deemed to be received or acquired solely for the benefit of Scouting," (Doc. No. 110-2 at 5), does not appear controlling on the issue of whether the Rasmussens properly transferred property to the PA. The phrase "acquired solely for the benefit of Scouting" is ambiguous: property could be transferred to a parents' association and still be used for the "benefit

of Scouting."  Notably, the rule does not state that the property is exclusively owned by the Council or that property may never be transferred.

On the other hand, this rule *suggests* that such transfers are improper, especially when read in conjunction with the rule stating that the property of a unit, upon expiration of the unit's charter, "shall be held in trust by the chartering organization . . . pending reorganization of the unit or for the promotion of the program of the Boy Scouts of America."  (*Id.* at 6.)  As a practical matter, property cannot be given to a chartering organization to hold in trust if the unit transfers that property to a third party before the unit's charter expires.  However, where contractual terms are ambiguous, the Court must look to extraneous facts to determine the understanding between the parties.  *E.g.*, *Emrald Point Prop. Owners Assoc., Inc. v. Com. Const. Indus., Inc.*, 978 So. 2d 873, 877-78 (Fla. 4th DCA 2008).   The Rasmussens contend that it was their understanding that the transfer of property to the PA was acceptable and indeed necessary to appease the chartering organization.   This conclusion was based on their interactions with the other parents and the representative of the chartering organization, Mike Bross.  (Doc. No. 120-2 ¶¶ 12, 15, 27; Doc. No. 120-6 ¶¶ 3-8; Doc. No. 120-7 ¶¶ 3-8; Doc. No. 120-8 ¶¶ 3-8; Doc. No. 120-9 ¶¶ 3-7; Doc. No. 120-11 ¶¶ 3-6; Doc. No. 120-12 ¶¶ 3-8; Doc. No. 120-13 ¶¶ 3-8.)  The Council, of course, presents affidavits portraying the opposite: that no one agreed to transfer property, and the chartering organization never asked for the property to be transferred.  (Doc. No. 112 ¶¶ 3-8; Doc. No. 113 ¶¶ 3-8; Doc. No. 114 ¶¶ 3-8.)  These conflicting affidavits suffice to create a genuine issue of material fact.

As for the Rasmussens, their contention regarding the level of intent necessary to be liable for conversion is simply incorrect.  Specifically, the Rasmussens contend that:

> The possessors of the property (The Parents Association) would have to have a good faith belief that Counterclaim Plaintiff is the owner of said property or that they [sic] had possessory rights greater than the Parents Association and the Counterclaim Plaintiff would have had to then make a demand on the possessor of the property who would then have to refuse that request with the intent to keep the property from the lawful possessor of the property.

(Doc. No. 130 at 15.)  As an initial matter, it is not even clear what is being argued in this passage. It appears that the Rasmussens are arguing that a party can be liable for conversion only if the party has a "good faith" belief that the property he or she possesses actually belongs to someone else. Even if the Court were to generously interpret this argument as contending that scienter or culpability is a requirement for conversion, the argument would still be incorrect.  The so-called "intent to deprive" for purposes of conversion means an intent to exercise exclusive dominion over the property. *See Senfeld*, 450 So. 2d at 1161.  It does not require a *mens rea*, vis-á-vis criminal law, to commit a wrongful act.  Restatement (Second) of Torts § 244 (1965) ("An actor is not relieved of liability to another . . . for conversion by his belief, because of a mistake of law or fact not induced by the other, that he (a) has possession of the chattel or is entitled to its immediate possession, or (b) has the consent of the other or of one with power to consent for him, or (c) is otherwise privileged to act.").  In other words, the Rasmussens can be liable for conversion regardless of whether they believed the Council had greater rights to the property.  *See id.*

Moreover, the Rasmussens are incorrect that the "demand" requirement for conversion is unsatisfied.  Under Florida law, there is no strict requirement for demand if the conversion of property can be shown through other sources of proof.  *Senfeld*, 450 So. 2d at 1161.  In any event, the Council sent a demand letter to the Rasmussens.  (Doc. No. 120-2 ¶ 71.)

Conflicting evidence exists with respect to the remainder of the issues.  As mentioned above, the parties present conflicting affidavits concerning whether the parents of the units agreed to

transfer property to the PA. They also present conflicting affidavits concerning the value of the items,[18] whether certain items exist, who owned the items in the first place, and whether the Rasmussens currently possess or ever possessed the items in question.[19] (*Compare* Doc. No. 110 ¶ 8, Doc. No. 112 ¶¶ 4-6, Doc. No. 116-1, *and* Doc. No. 116-2, *with* Doc. No. 120-2 ¶¶ 3-10, *and* Doc. No. 120-3 ¶¶ 3-10.)

Again, the Court acknowledges that the Council has identified various inconsistencies and contradictions in the Rasmussens' affidavits. (Doc. No. 157 at 2-11.) However, the Council has not established that these affidavits merely contradict earlier statements without explanation, so as to fall under the "sham affidavit rule." *Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc.*, 736 F.2d 656, 657 (11th Cir.1984) ("When a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear

_____

[18]    Neither party correctly values the allegedly converted property. The Rasmussens claim that much of the property has a value of "$0" because it was donated. (Doc. No. 120-2 ¶¶ 8-9.) The Council has valued the items by reference to the current market value of a replacement. (Doc. No. 116-2 at 1.) Contrary to both assertions, the value of converted property is determined by the market value of the actual converted property at the time it was converted. Restatement (Second) of Torts § 225 cmt. d. Valuation according to the current market value would produce a potential windfall to the defendant, if the market value of the property has since dropped, or to the plaintiff, if the market value of the property has since increased. *See, e.g.*, *Knuth v. Erie-Crawford Dairy Co-op. Ass'n*, 463 F.2d 470, 480 (3d Cir. 1972) (citing Restatement (Second) of Torts § 225 cmt. d).

[19]    The Rasmussens can be liable for conversion even if they do not currently possess the property. *E.g.*, Restatement (Second) Torts § 233 (listing various methods of committing a conversion); *id.* § 235(1) ("[O]ne who makes an unauthorized delivery of a chattel to a person not entitled to its immediate possession is subject to liability for conversion to another who is so entitled."). They can also be liable for directing an agent to take possession of the property, Restatement (Third) of Agency § 7.04, or for acting in concert with other tortfeasors, *Acadia Partners, L.P. v. Tompkins*, 759 So. 2d 732, 736 (Fla. 5th DCA 2000) (citing Restatement (Second) of Torts § 876).

testimony.").  To the extent these inconsistencies may serve as impeachment evidence, the Rasmussens' credibility as witnesses will be evaluated at trial along with the factual issues addressed in their affidavits.  Accordingly, the Court will deny summary judgment for all parties on this claim.

## IV.    Supplemental Jurisdiction

The Council's claims for an accounting and conversion are styled as "permissive counterclaims."  (Doc. No. 17 at 10.)  The basis for subject matter jurisdiction over these claims is apparently supplemental jurisdiction under 28 U.S.C. § 1367.  (*See id.*)  Under that statute, this Court has jurisdiction over these claims to the extent the counterclaims constitute the same "case or controversy" or "common nucleus of operative fact" as Mrs. Rasmussen's ADA claim.  *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 213-14 (2d Cir. 2004) (claim for race discrimination under the Equal Credit Opportunity Act and counterclaim for debt were sufficiently related because they originated from the "[p]laintiffs' decisions to purchase Ford cars"); *Channel v. Citicorp Nat'l Servs., Inc.*, 89 F.3d 379, 386 (7th Cir. 1996) (claim for violation of Consumer Leasing Act and counterclaim for debts due under the lease were sufficiently related because they arose from the same lease contract); *Kourmarian v. Chase Bank USA, N.A.*, No. C-08-4033 MMC, 2008 WL 5120053, at * 2-3 (N.D. Cal. Dec. 3, 2008).[20]  It is not necessary for the claim and counterclaim to arise from the same "transaction or occurrence," as would be required to constitute a compulsory counterclaim.  *Jones*, 358 F.3d at 213-14.  Because Mrs. Rasmussen's ADA claims and the Council's counterclaims all relate to Palma and Keith Rasmussen's involvement in the Boy Scouts,

---

[20]    The Eleventh Circuit has not opined on whether a district court may exercise supplemental jurisdiction over a permissive counterclaim pursuant to 28 U.S.C. § 1367.  *Premium Leisure, LLC v. Gulf Coast Spa Mfrs., Inc.*, No. 8:08-cv-1048-T-24 EAJ, 2008 WL 3927265, at *3 (M.D. Fla. Aug. 21, 2008).

the claims and counterclaims arise from the same core facts, and this standard therefore appears to be met. *See id.*; *Parker*, 468 F.3d at 743 (federal and state claims where sufficiently related where they all arose from the defendant's "operation of a junkyard adjacent to the [plaintiff's] property").

Further, the Court will exercise its discretion to retain supplemental jurisdiction over the counterclaims. Section 1367(c) of Title 28 allows courts to decline supplemental jurisdiction in instances where:

> (1) the claim raises a novel or complex issue of State law,
> (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
> (3) the district court has dismissed all claims over which it has original jurisdiction, or
> (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). If, after examining the factors listed in § 1367(c), the district court "decides that it has the discretion . . . to decline jurisdiction . . . , it should consider the traditional rationales for pendent jurisdiction, including judicial economy and convenience, in deciding whether or not to exercise that jurisdiction." *Palmer v. Hosp. Auth. of Randolph County*, 22 F.3d 1559, 1569 (11th Cir. 1994).

The only portion of the statute particularly relevant to this case appears to be subsection (c)(3). The Eleventh Circuit has explained that this ground for declining jurisdiction generally applies when the federal claims "drop out of the lawsuit in its early stages." *Parker*, 468 F.3d at 746. Because Mrs. Rasmussen's ADA claims were resolved within two months of the scheduled trial and after the parties completed discovery, the Court does not believe that it is appropriate to dismiss the counterclaims under this provision.

Having fully considered the factors listed in 28 U.S.C. § 1367(c) and the traditional rationales for pendent jurisdiction, the Court retains supplemental jurisdiction over the Council's state law counterclaims.

**Conclusion**

Based on the foregoing:

1.  The Motion of Central Florida Council Boy Scouts of America, Inc. ("the Council") for Summary Judgment on Palma Rasmussen's Claim Under the Americans with Disabilities Act (ADA) and the Council's Claim for Conversion (Doc. No. 100, filed July 29, 2008) is **GRANTED in part and DENIED in part** as stated in this Order. Counts III and V of Palma Rasmussen's Amended Complaint (Doc. No. 7, filed Oct. 12, 2007) are **DISMISSED without prejudice** for lack of subject matter jurisdiction to the extent the claims are premised on the alleged non-accessability of the Trading Post.[21] Summary Judgment is **DENIED** in all other respects.

2.  The Motion of Palma Rasmussen for Summary Judgment on her Claim Under the ADA (Doc. No. 122, filed Sept. 8, 2008) is **DENIED**.

3.  The Motion of Palma and Keith Rasmussen for Summary Judgment as to the Council's Claim for Conversion (Doc. No. 144, filed Oct. 24, 2008) is **DENIED**.

4.  The Motion of the Council for Summary Judgment on its Claim for Accounting (Doc. No. 149, filed Nov. 3, 2008) is **DENIED**.

---

[21]     As a result, no claims from the Amended Complaint remain pending before the Court. (*See* Doc. No. 76 at 22.)

5.     The Motion of the Council to Strike Palma and Keith Rasmussen's Response in Opposition to the Council's Motion for Summary Judgment (Doc. No. 168, filed Dec. 10, 2008) is **DENIED**.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on February 9, 2009.

PATRICIA C. FAWSETT, JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:

Counsel of Record