CENTRAL FLORIDA COUNCIL,
BOY SCOUTS OF AMERICA, INC.,

      **Counterclaim Plaintiff,**

-vs-             **Case No.  6:07-cv-1091-Orl-19GJK**

PALMA RASMUSSEN and
KEITH RASMUSSEN,

      **Counterclaim Defendants.**
_____

# ORDER

This case comes before the Court on the following:

1.  Motion for Default Judgment by Counterclaim Plaintiff Central Florida Council Boy Scouts of America, Inc. (Doc. No. 200, filed Sept. 28, 2009);

2.  Motion to Admit Evidence of Equipment Valuation by Counterclaim Plaintiff Central Florida Council, Boy Scouts of America, Inc. (Doc. No. 222, filed Jan. 27, 2010);

3.  Post-Hearing Memorandum in Support of Entry of Judgment by Counterclaim Plaintiff Central Florida Council, Boy Scouts of America, Inc. (Doc. No. 226, filed Feb. 22, 2010);

4.  Post Trial Brief in Lieu of Closing Argument by Counterclaim Defendants Palma Rasmussen and Keith Rasmussen (Doc. No. 229, filed Mar. 5, 2010); and

5.       Post-Hearing Reply Memorandum in Support of Entry of Judgment by Counterclaim Plaintiff Central Florida Council, Boy Scouts of America, Inc. (Doc. No. 231, filed Mar. 19, 2010).

## Background

On November 7, 2007, Central Florida Council, Boy Scouts of America, Inc. ("Council") filed a two-count Amended Counterclaim against Palma Rasmussen and Keith Rasmussen ("Rasmussens"), asserting that: (1) the Council is entitled to an accounting from the Rasmussens to determine whether they improperly used the Council's funds to pay for personal expenses or to profit from the sale of infringing apparel; and (2) the Rasmussens converted various camping, sporting, and other equipment. (Doc. No. 17 at 10-15.) On December 5, 2007, the Rasmussens filed Answers to the Council's Counterclaim. (Doc. Nos. 23-24.)

On August 28, 2009, the Court granted the Motion for Sanctions by the Council, (Doc. No. 176, filed Feb. 23, 2009), struck the Rasmussen's Answers to the Council's Counterclaim, and ordered the Clerk of Court to enter a default against the Rasmussens and in favor of the Council on both counts of the Council's Counterclaim. (Doc. No. 196 at 16.) The Court also directed the Council to submit a Motion for Default Judgment within thirty days from the date of the Order. (*Id.*) On September 28, 2008, the Council timely filed a Motion for Default Judgment. (*Id.*; Doc. No. 200.)

On January 26 and 27, 2010, the Court held an evidentiary hearing on the Motion for Default Judgment. (Doc. Nos. 217-18.) During the hearing, the Council moved to admit evidence of equipment valuation, (Doc. No. 222, filed Jan. 27, 2010), and the Court deferred ruling on that Motion. The Court allowed the parties to submit briefs in lieu of closing arguments. (Doc. No. 224

at 129-32, filed Feb. 11, 2010.)   On February 22, 2010, the Council filed a Post-Hearing Memorandum in Support of Entry of Judgment.   (Doc. No. 226.)   On March 5, 2010, the Rasmussens filed a response, and on March 19, 2010, the Council filed a reply to the response. (Doc. Nos. 229, 231.)

## Standard of Review

A default judgment may not be entered by the Court solely on the basis of the clerk's entry of default.  Rather, the allegations in the Complaint must present a "sufficient basis" to support the default judgment on the issue of liability.  *Nishimatsu Const. Co., Ltd. v. Houston Nat'l Bank*, 515 F.2d 1200, 1206 (5th Cir. 1975); *see also Eagle Hosp. Physicians, LLC v. SGR Consulting, Inc.*, 561 F.3d 1298, 1307 (11th Cir. 2009) (reviewing whether the well-pled facts stated a claim where the district court ordered a default judgment pursuant to its inherent powers to sanction litigants); *Chudasama v. Mazda Motor Corp.*, 123 F.3d 1353, 1371 n.41 (11th Cir. 1997) ("Regardless of the willfulness of a party's discovery violation, a default judgment cannot stand on a complaint that fails to state a claim.").  "While 'a default is not treated as an absolute confession by the defendant of his liability and of the plaintiff's right to recover,' a defaulted defendant is deemed to 'admit[ ] the plaintiff's well-pleaded allegations of fact.'"  *Tyco Fire & Sec., LLC v. Alcocer*, 218 F. App'x 860, 863 (11th Cir. 2007) (quoting *Nishimatsu Const. Co., Ltd.*, 515 F.2d at 1206); *Buchanan v. Bowman*, 820 F.2d 359, 361 (11th Cir. 1987).  Prior to entering a default judgment, the court "must ensure that the well-pleaded allegations in the complaint, which are taken as true due to the default, actually state a substantive cause of action and that there is a substantive, sufficient basis in the pleadings for the particular relief sought." *Tyco Fire & Sec., LLC*, 218 F. App'x at 863.  Where a complaint

fails to state a claim, a default judgment on the complaint may not stand. *United States v. Kahn*, 164 F. App'x 855, 858 (11th Cir. 2006).

Once liability is established, the Court turns to the issue of relief. Pursuant to Federal Rule of Civil Procedure 54(c), "[a] default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." If unspecified monetary damages are sought, the party moving for default judgment has the burden to prove the unliquidated sums in a hearing on damages or otherwise. Fed. R. Civ. P. 55(b)(1)-(2); *Eisler v. Stritzler*, 535 F.2d 148, 153-54 (1st Cir. 1976).

## Analysis

### I. Accounting of Funds

#### A.  Liability

In Count I of its Counterclaim, the Council asserts a claim for an accounting from the Rasmussens to determine whether they improperly used the Council's funds: (1) to pay for personal expenses; or (2) to profit from the sale of infringing apparel to scouts and scout leaders within the Council. (Doc. No. 17 ¶¶ 18-19.) Under Florida law, a party seeking an equitable accounting must: (1) show the existence of a fiduciary relationship or a complex transaction; and (2) demonstrate that the remedy at law is inadequate. *Kee v. Nat'l Reserve Life Ins. Co.*, 918 F.2d 1538, 1540 (11th Cir. 1990) (citing *F.A. Chastain Constr., Inc. v. Pratt*, 146 So. 2d 910, 913 (Fla. 3d DCA 1962)).

Taking the factual allegation of the Council's counterclaim as true due to the entry of default, *Tyco Fire & Sec., LLC*, 218 F. App'x at 863, the Rasmussens "assumed key leadership positions in Pack 700, Troop 700, and Crew 700 between January 2003 and October 2007," and the Rasmussens were "in control of the finances of Pack, Troop, and Crew 700 since approximately August 2005." (Doc. No. 17 ¶¶ 5-6.) In light of these positions of power and trust, the Rasmussens were fiduciaries

of the Pack, Troop, and Crew 700 between January 2003 and October 2007. *See Dale v. Jennings*, 107 So. 175, 179 (Fla. 1925) (finding a fiduciary relationship implied in law when "confidence is reposed by one party and a trust accepted by the other."); *id.* ("[T]he relation and duties involved in [a fiduciary relationship] need not be legal, but may be moral, social, domestic, or merely personal."); *Snead v. U.S. Trucking Corp.*, 380 So. 2d 1075, 1078 (Fla. 1st DCA 1980) ("The relationship of a director and of an officer to the corporation and its stockholders is that of a fiduciary.").

Alternatively, the Rasmussens' transactions using the Pack, Troop, and Crew 700 bank accounts were complex. Transactions may be complex due to aggregation or intermingling. *See Craft v. Craft*, 76 So. 772, 774 (Fla. 1919) (permitting an equitable accounting where a trustee sold a plaintiff's lots by intermingling them among various multiple-lot sales and thus prevented a precise calculation of the sales proceeds owed to Plaintiff). The Rasmussens controlled the Pack, Troop, and Crew finances and required scouts to purchase the Rasmussens' embroidered scouting items with the scouts' own funds or the funds of the Pack, Troop, and Crew. (Doc. No. 17 ¶¶ 5, 6, 13.) Although these transactions were arguably not complex when viewed individually, the transactions were complex in the aggregate because many transactions occurred over several years without any accounting being made and because the transactions involved a combination of scouts' personal funds and Pack, Troop, and Crew funds. (Doc. No. 17 ¶¶ 13, 17.) Thus, the first element of an accounting claim is satisfied here by either the existence of a fiduciary relationship or, alternatively, a complex transaction.

As to the second element, the inadequacy of a remedy at law, the Court finds no evidence from which it may infer a contractual relationship between the Rasmussens and the Council, and the

Court does not find any remedy, other than an equitable accounting, under which the Council could obtain a judgment against the Rasmussens for improper use of the Council's funds. *See Kee*, 918 F.2d at 1541 ("When a judgment for breach of contract is obtainable, the remedy at law is considered adequate, precluding the need for the imposition of an equitable remedy.") (citing *Mary Dee's, Inc. v. Tartamella*, 492 So. 2d 815, 816 (Fla. 4th DCA 1986)); *Mary Dee's, Inc.*, 492 So. 2d at 816 ("The test of inadequacy of remedy at law is whether a judgment can be obtained . . . ."). Thus, the Council has no adequate remedy at law.

Finding that both elements of an equitable accounting are established, a default judgment should be entered in favor of the Council and against the Rasmussens for an accounting of the Council's funds improperly used: (1) for personal expenses; and (2) to profit from the sale of apparel to scouts and scout leaders within the Council.

### B. Relief for Improperly Using Funds to Profit from the Sale of Apparel

The parties do not identify, and the Court has not found, any evidence in the record that the Rasmussens' improperly used the Council's funds to profit from the sale of apparel to scouts and scout leaders within the Council. Accordingly, the Court awards no relief on the Council's accounting claim against the Rasmussens for the improper use of funds to profit from the sale of apparel.

### C. Relief for Improperly Using Funds to Pay for Personal Expenses

The Council seeks damages in an amount equal to the Rasmussens' personal expenses paid from the Pack, Troop, and Crew 700 bank accounts (collectively, "Accounts")[1] between March 9,

---

[1] There are three bank accounts at issue. The Crew Account (account number ending in '8370) was opened at Wachovia Bank by Palma and Keith Rasmussen on February 5, 2004, and was
(continued...)

2004 and May 27, 2008.[2]  (Doc. No. 226 at 6-17; Doc. No. 226-1.)  The Rasmussens argue that no

damages should be awarded on the accounting claim because the Council failed to present any

credible proof that reimbursement for expenses is not available in scouting.  (Doc. No. 229 at 4-5.)

This argument must be rejected because the Rasmussens, not the Council, bear the burden of proof

once the right to an accounting has been established.  As stated by the United States Court of

Appeals for the Fifth Circuit:

> An accounting is a species of compulsory disclosure, predicated upon the assumption
> that the party seeking relief does not have the means to determine how much – or, in
> fact, whether – any money properly his is being held by another.  The appropriate
> remedy, particularly where the determinations may be detailed and complex, is an
> order to account in a proceeding in which the burden of establishing the
> non-existence of money due to the plaintiff rests upon the defendant.  Because of the
> very nature of the remedy, that burden cannot rest upon plaintiff, but must shift to the
> defendant once facts giving rise to a duty to account have been alleged and admitted.

*Garcia v. Koch Oil Co. of Tex. Inc.*, 351 F.3d 636, 641 (5th Cir. 2003) (quoting *Rosenak v. Poller*,

---

[1](...continued)
closed in November 2007.  (Joint Ex. 22.)  The Pack Account (account number ending in '4176) was
opened at Riverside Bank by the Rasmussens on September 20, 2007, and was closed on or about
June 17, 2008.  (Joint Ex. 13.)  Palma Rasmussen became an authorized signer on the Troop
Account at Riverside Bank (account ending in '7047) on August 12, 2005, and the Rasmussens both
became authorized signers on the Troop Account on January 12, 2007.  (Joint Ex. 12.)

[2] Although the Council alleges that the Rasmussens were in control of the Accounts "since
approximately August 2005," the parties do not cite, and the Court does not find, any authority that
this general factual allegation would prohibit the Court from considering whether the Rasmussens
properly accounted for funds in the Accounts prior to that date.  (Doc. No. 17 ¶ 6.)  Rather, in light
of the Council's allegations that the Rasmussens assumed leadership positions in the Pack, Troop,
and Crew starting in January 2003 and that the Council is unable to determine whether the
Rasmussens made improper use of funds, (*Id.* ¶¶ 5, 20), the accounting should proceed from the date
when either Palma or Keith Rasmussen first became an authorized user on each account.  *See
Garcia*, 351 F.3d at 641 ("An accounting is a species of compulsory disclosure, predicated upon the
assumption that the party seeking relief does not have the means to determine how much – or, in
fact, whether – any money properly his is being held by another.").

290 F.2d 748, 750 (D.C. Cir. 1961)).  Because, as discussed above, the Rasmussens have a duty to account, the burden is on them to show that the transactions at issue were legitimate, and they must do so by "competent and substantial evidence."  *See Beckerman v. Greenbaum*, 439 So. 2d 233, 236 (Fla. 2d DCA 1983) ("Once appellant's right to the accounting and the five percent of net profits was determined, the appellees had the burden of establishing each credit or deduction by competent and substantial evidence.").  The Supreme Court of Florida has defined substantial evidence as "such evidence as will establish a substantial basis of fact from which the fact at issue can be reasonably inferred."  *De Groot v. Sheffield*, 95 So. 2d 912, 916 (Fla. 1957).  For substantial evidence to also constitute competent evidence, "the evidence relied upon 'should be sufficiently relevant and material that a reasonable mind would accept it as adequate to support the conclusion reached."  *Marion County v. Priest*, 786 So. 2d 623, 625 (Fla. 5th DCA 2001) (quoting *De Groot v. Sheffield*, 95 So. 2d at 916).  With this standard of proof in mind, the Court turns to the evidence in the record on the issue of accounting.

Palma Rasmussen testified that reimbursements for travel and other expenses were authorized by vote of a committee consisting of the parents of the Troop, Crew, and Pack members ("Committee"), and that the Committee voted to reimburse her for the expenses that she incurred on the Accounts.  (Doc. No. 223 at 58.)  Palma Rasmussen also averred that the Committee authorized her to use a debit card to pay for gasoline expenses.  (*Id.* at 68-69.)  She maintained that the Committee, not the Council or any other scouting entity, set the limits and the terms of how scouting funds are to be used, including if the funds were to be used for reimbursements.  (Doc. No. 223 at 59-60; Doc. No 224 at 36-37.)  Palma Rasmussen further explained why she but not other parents, volunteers, or scouting leaders was reimbursed for expenses:

> Well, number one, I was a leader. Number two, I was also on many occasions, on most occasions, I was asked to not only pick up children, but deliver them back as well. With regards to food, children came to our meetings without having eaten, so they would be fed. I would never – and that was the committee's decision, that if somebody came to our unit hungry, they would be fed. It was no – there were no holes (sic) barred. That was the issue. And also, it made it – we also had at one point a very big unit, because of the fact that people know that the children would be taken care of. Their needs would be taken care of. Their needs would be facilitated.

(Doc. No. 224 at 37-38.) Palma Rasmussen further asserted that all of the funds were used "for the boys within the program and issued with the agreement of the [C]ommittee." (*Id.* at 38.)

Keith Rasmussen corroborated Palma Rasmussen's testimony that the Committee alone decided whether to make reimbursements. (*Id.* at 71.) He explained that he was reimbursed for travel under the following circumstances:

> if we had to do any kind of work or errands or any caretaking for any of the children that were under our care, you know, going to the scout shop, going to camp, picking the kids up, dropping them off on a regular basis, service projects, things of that nature.

(*Id.* at 66.) He also stated how the food purchased from the Accounts was used:

> Sometimes we would have to restock the unit pantry, which we did keep, because there were a lot of staples that we would keep on-hand for camping trips. We had a lot of low-income kids in our units, and some of them would show up or we'd have to pick them up for meetings and they had not eaten, sometimes in a day or two. So as caretakers for these children, we made sure they ate. Sometimes there were activities where food was involved, so we had to take care of the food.

(*Id.* at 66-67.)

Other witnesses testified, contrary to the Rasmussens' assertions, that the Committee never approved the food, fuel, and other expenses debited from the Accounts by the Rasmussens. Kenneth

Estes, a former leader in Troop 700 and Crew 700,[3] testified that he attended the monthly Committee meetings from June 2003 until May 2007. (Doc. No. 223 at 5-6, filed Feb. 11, 2010.)  Estes maintained that the role of the Committee was to "assist in the planning and the financial responsibility of the troop."  (Doc. No. 223 at 6-7.)  Estes asserted that from June 2003 through August 2005, no Troop or Crew leaders were reimbursed for gas, no food and drinks were served at Troop or Crew meetings or service projects, and no meetings were held at restaurants.  (Doc. No. 223 at 8.)  Estes further testified that the Committee never authorized Palma Rasmussen or anyone else to be reimbursed for travel expenses, although the Committee discussed on one or two occasions whether to reimburse people for gasoline.  (Doc. No. 223 at 35; Doc. No. 224 at 48.)  Estes also stated that the Committee was never advised that the Rasmussens were using scouting funds to pay for gasoline.  (Doc. No. 223 at 10-11.)

Estes maintained that he took regular minutes at the Committee meetings[4] between August 2005 and April 21, 2007, pursuant to his duties as the Secretary of the Committee.[5]  (Doc. No. 224 at 51-53; Pl. Ex. 2B.)  Estes asserted that the Committee meeting minutes would reflect any

---

[3] Estes further testified that he previously served as an Assistant Scoutmaster for the Troop, the Crew Advisor, and the Troop and Crew Quartermaster, and that he currently serves as a Unit Commissioner for the Challenger District of the Central Florida Boy Scouts Council. (Doc. No. 223 at 5-6, 14.)

[4] Estes testified that the Committee meetings consisted of a joint meeting of the Pack, Troop, and Crew committees and that Estes' Committee meeting minutes represented a discussion of the joint meeting.  (Doc. No. 224 at 54.)

[5] Estes further testified that he took complete and contemporaneous minutes of the Committee meetings, that he dated the minutes, and that the minutes were chronologically recorded in a spiral-bound notebook.  (Doc. No. 224 at 55, 57.)  Estes explained that two sets of meeting minutes were stapled to the back of the notebook because he had previously removed them from the notebook so that Palma Rasmussen could type those minutes to present to a bank.  (*Id.* at 61.)  Over the Rasmussens' objection, the Court admitted the spiral-bound notebook of Committee meeting minutes into evidence.  (Pl. Ex. 2B.)

reimbursement for gasoline expenses to Palma Rasmussen approved by the Committee. (Doc. No. 224 at 57-58.) The Committee meeting minutes taken by Estes showed no votes by the Committee to reimburse the Rasmussens or any other persons for food, fuel, or any other expenses. (Pl. Ex. 2B.) However, some reimbursements did occur during the time period of Estes' Committee meeting minutes, as Estes was reimbursed for purchasing a tool kit and scout clothing by a Crew account check signed by Palma Rasmussen in the amount of $45.00, dated February 11, 2006. (Pl. Ex. 7; Doc. No. 224 at 48, 58-60.) Estes testified that the Rasmussens requested him to purchase these items and that he was reimbursed by the $45.00 check. (Doc. No. 224 at 48, 58-60.) On cross-examination, Estes acknowledged that he knew of no policy prohibiting the Committee from reimbursing the Rasmussens for food, fuel, or travel expenses. (Doc. No. 223 at 33-34; Doc. No. 224 at 48-49.)

The Rasmussens' dispute the accuracy of the Committee meeting minutes taken by Estes. (Doc. No. 229 at 3.) Keith Rasmussen testified that Estes was in fact the Secretary of the Committee for approximately one month, not two years as Estes had asserted. (Doc. No. 224 at 68.) The Rasmussens also asserted that Estes was biased against them due to allegations which led Estes to step down from his troop leadership positions in 2007. (Doc. No. 224 at 69, 120-22, 125.) Regardless of whether Estes was biased against Plaintiffs, his records of the Committee meetings were taken at a time when apparently neither he nor any other participant in the Scout units headed by the Rasmussens knew that Rasmussens were reimbursing themselves for alleged Scouting expenses. (Doc. No. 223 at 10-13; Doc. No. 224 at 86, 91-92.) Therefore, the log kept by Estes contemporaneously with the meetings is reliable to the extent it reflects no authorization by the Committee to the Rasmussens for reimbursement of expenses.

The testimony of Mary Kofil, like the testimony of Kenneth Estes, contradicted the Rasmussens' claims that the Committee authorized their expenditures from the Accounts. Kofil testified that she attended every monthly Committee meeting between 2003 and 2007 and that she did not recall any discussion at Committee meetings about reimbursing the Rasmussens for gasoline expenditures. (Doc. No. 224 at 86.) Kofil also asserted that she was not aware of any parents being reimbursed for gasoline expenditures. (*Id.* at 89.) She further maintained that she never saw food being served at scout meetings and that scout meetings were never held at restaurants. (*Id.* at 90.)

The Rasmussens provided annotated bank statements with short explanatory phrases for many of the debits from the Accounts. (Joint Ex. 11-13.) The Council argues that the Rasmussens' annotations are not credible because: the Rasmussens did not explain the frequency, timing, and amount of the transactions; the annotations were vague; the annotations failed to identify any specific beneficiaries of the expenses; and the Rasmussens kept no contemporaneous record of the expenses. (Doc. No. 226 at 7-8, 12-16.) However, the Court need not address the credibility of these annotations because the annotations, even if presumed true, are not probative of whether the Committee approved the expenses as contended by the Rasmussens.

In summary, it is undisputed that the Committee determined whether to authorize the Rasmussens to use funds from the Accounts to pay for expenses. However, the Rasmussens' failed to provide by competent and substantial evidence that any of the $59,956.25 that they debited from the Accounts between February 2004 and May 2008 was authorized by the Committee. The Rasmussens' assertions that the Committee authorized all of these expenses are contradicted by the Committee meeting minutes and the testimony of Kenneth Estes and Mary Kofil who testified that the Committee did not authorize the Rasmussens to be reimbursed for food, travel, or any other

expenses. Moreover, the Rasmussens' bank statement annotations and the Rasmussens' assertions that their expenses benefitted needy scouts, not themselves, are irrelevant to the issue of whether the Committee approved the expenses. There is no evidence in the record other than the Rasmussens' own testimony that the Committee approved the expenses they incurred on the Accounts. The Court finds the testimony of Estes and Kofil more credible than the testimony of the Rasmussens on the issue of whether the Committee authorized the Rasmussens to reimburse themselves for expenses. The Rasmussens' self-serving, contradicted testimony that the Committee approved the expenses at issue, without more, is not sufficient evidence from which the Court may reasonably infer that any part of the $59,956.25 debited from the Accounts by the Rasmussens was legitimate. Accordingly, the Rasmussens have failed to account for any of the $59,956.25 debited from the Accounts.

Of the $59,956.25 debited from the Accounts by the Rasmussens, the Council concedes that $27,227.47 of those expenses were potentially legitimate, and thus the Council requests a judgment for the remaining $32,728.78. (Doc. No. 226 at 16-17; Doc. No. 226-1.) Accordingly, judgment should be entered in favor of the Council and against the Rasmussens in the amount of $32,728.78 on the Council's claim for an accounting.

## II. Conversion of Scouting Equipment

### A. Liability

In Count II of its Counterclaim, the Council asserts that the Rasmussens converted "various camping, sporting, and other equipment, including canoes" ("Equipment"), that was possessed by the Pack, Troop, and Crew 700 and was owned by Good Shepherd Lutheran Church ("Church"), the chartered organization of the Pack, Troop, and Crew 700. (Doc. No. 17 ¶¶ 23-24.) As discussed

above, the Court must first determine whether the well-pled allegations, presumed true due to the entry of default, properly state a claim for conversion. *Tyco Fire & Sec., LLC*, 218 F. App'x at 863.

"[C]onversion is an unauthorized act which deprives another of his property permanently or for an indefinite time." *Nat'l Union Fire Ins. Co. of Pa. v. Carib. Aviation, Inc.*, 759 F.2d 873, 878 (11th Cir. 1985) (quoting *Senfeld v. Bank of N.S. Trust Co.*, 450 So. 2d 1157, 1160-61 (Fla. 3d DCA 1984)). "[T]he essence of conversion is not the possession of property by the wrongdoer, but rather such possession in conjunction with a present intent on the party of the wrongdoer to deprive the person entitled to possession of the property." *Senfeld*, 450 So. 2d at 1161. Such intent may be shown by, *inter alia*, the plaintiff's demand for return of the property and the defendant's refusal to return it. *Id.* In addition, the claimant must establish "possession or an immediate right to possession of the converted property at the time of conversion."[6] *United States v. Bailey*, 419 F.3d 1208, 1212 (11th Cir. 2005). Thus, conversion is established by proof of: (1) the plaintiff's immediate right to possession of property when taken; and (2) the defendant's refusal to return property upon demand. These two elements also establish a claim of replevin,[7] which unlike

---

[6] The Rasmussens cite *United States v. Bailey*, 288 F. Supp. 2d 1261 (M.D. Fla. 2000), in arguing that the Council has no standing to assert a claim against the Rasmussens for conversion of the Equipment because there "was no proof that [the Council] was entitled to any property at the time of conversion." (Doc. No. 229 at 2.) This argument goes to the sufficiency of the evidence, not standing, because standing is determined at the time a case is filed and is not dependent on the proof received by a court on the merits. *See, e.g.*, *Moyer v. Walt Disney World Co.*, 146 F. Supp. 2d 1249, 1253 (M.D. Fla. 2000). In any case, as discussed below, the Council established an immediate right to possess the Equipment at the time of conversion through its well-pled factual allegations presumed true due to the entry of default.

[7] "The cause of action for replevin first arises with the refusal to return the property upon demand." *Senfeld*, 450 So.2d 1157, 1161 n.5. Unlike conversion, replevin does not require an intent to deprive by the defendant, but both causes of action are established by: (1) the plaintiff's immediate right to possession when the item is taken and demand; and (2) the defendant's refusal to return the subject property upon demand. *Id.* at 1161-62.

conversion, permits the plaintiff to recover possession of the personalty taken by the defendant. *See Williams Mgmt. Enters., Inc. v. Buonauro*, 489 So. 2d 160, 161 n.1, 162 (Fla. 5th DCA 1986) (distinguishing between replevin, which permits the recovery of personal property and damages, and conversion, which permits only the recovery of money damages).

Both of these elements are established by the well-pled allegations in the Council's counterclaim for conversion which are taken as true due to the entry of default. The Council had an immediate right to possess the Equipment at the time of conversion because: the Pack, Troop, and Crew came into possession of the Equipment; all property held by the Pack, Troop, and Crew was owned by the Church; the Rasmussens took possession of the Equipment without authorization; and the Church assigned its rights in the Equipment to the Council "in order that [the Council] may obtain the return of the [E]quipment." (Doc. No. 17 ¶¶ 23-25, 29); *see Rose v. Teitler*, 736 So. 2d 122, 122 (Fla. 4th DCA 1999) ("[I]t is well established that an assignment transfers to the assignee all the interests and rights of the assignor in and to the thing assigned.") (internal quotations omitted). Further, the element of demand and refusal is satisfied by the letter from the Church to the Rasmussens demanding return of the Equipment and the Rasmussens failure to return the Equipment. (*Id.* ¶ 26; Doc. No. 17-1 at 3.) Thus, the Council's well-pled factual allegations state a claim for conversion.

### B. Relief Requested

The Council maintains that the testimony of Kenneth Estes as to the monetary value of the Equipment is admissible and that the Court should award $23,512.00 in monetary damages on the conversion claim. (Doc. No. 226 at 17-28.) The Rasmussens argue in opposition that Estes' testimony is inadmissible and that the Council has failed to carry its burden of proving monetary

damages. (Doc. No. 229 at 3-4.) The Rasmussens also assert that monetary damages should not be awarded on the conversion claim because the Council did not demand monetary damages as relief. (*Id.* at 4.)

### 1. Whether Monetary Damages May Be Awarded

"A default judgment *must not* differ in kind from, or exceed in amount, what is demanded in the pleadings." Fed. R. Civ. P. 54(c) (emphasis added). In its claim for conversion, the Council requests that the Equipment be returned and "any other relief as the Court deems just and proper under the circumstances." (Doc. No. 17 at 15.) As to the request for "any other relief as the Court deems just and proper under the circumstances," such language "is mere boilerplate, meant to cover all bases as to the claims asserted in the complaint." *Silge v. Merz*, 510 F.3d 157, 160 (2d Cir. 2007) (quoting *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1277 n.6 (9th Cir. 2006)). "[T]his formulaic language cannot substitute for the meaningful notice called for by Rule 54(c), which anticipates that defendants will look to the demand clause to understand their exposure in the event of default." *Id.*; *see also In re Ferrell*, 539 F.3d 1186, 1192-93 (9th Cir. 2008). Nowhere in its claim of conversion does the Council request monetary damages or any relief other than the return of the Equipment. (*See* Doc. No. 17 ¶¶ 27, 29 (alleging that the Church assigned its rights in the Equipment to the Council "in order that [the Council] may obtain the return of the equipment for use by Scouting youth").) Because the Council only demands return of the Equipment, the Council's conversion claim is actually one for replevin.[8] *See Rea v. Compactor-Baler Serv., Inc.*, 627 So. 2d 488, 489 (Fla. 2d DCA 1993) (noting that the plaintiff's request that the defendant return "all property

---

[8] Because the elements of conversion discussed above also establish a claim for replevin, the Council's well-pled allegations stating a claim for conversion also state a claim for replevin. *See supra* part II.A.

belonging to the corporation, including its books, records, personal property, accounts, funds, telephone, and telephone number" asserted an action in replevin).

The Council did not request an award of monetary damages on its conversion claim, and thus, Rule 54(c) prohibits the Court from entering a judgment for monetary damages on this claim. This is a harsh result where, as here, all parties have appeared and litigated the issue of whether to award monetary damages. Although the Court has found no Eleventh Circuit cases creating any exception to Rule 54(c), some Circuit Courts of Appeals have noted that there is no reason to apply Rule 54(c) in situations where, as here, the defaulting defendant actually appeared in the case and voluntarily argued an issue beyond the pleadings. As stated by Eighth Circuit:

> A court may not, without the consent of all persons affected, enter a judgment which goes beyond the claim asserted in the pleadings. . . . Unless all parties in interest are in court and have voluntarily litigated some issue not within the pleadings, the court can consider only the issues made by the pleadings, and the judgment may not extend beyond such issues nor beyond the scope of the relief demanded. . . . The foregoing rules are all fundamental and state nothing more than the essentials of due process and of fair play. They assure to every person his day in court before judgment is pronounced against him.

*Sylvan Beach v. Koch*, 140 F.2d 851, 861-62 (8th Cir. 1944). Further, the Second Circuit noted:

> [T]here is no sound basis for restricting [plaintiff] to the precise damages originally sought in a case where damages alleged were unliquidated, and where defendant did not default by non-appearance, but rather because of non-compliance with discovery procedures, and indeed was granted a full trial on the question of damages actually caused by the allegations established by its default.

*Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 78 (2d Cir. 1971),[9] *rev'd on other grounds*, 409 U.S. 363 (1973). On the other hand, other Circuit Courts of Appeals have applied Rule 54(c) to all

---

[9] A subsequent panel of the Second Circuit noted that *Trans World* was not dispositive of how Rule 54(c) should be applied in all cases because *Trans World* involved "highly unusual facts." *Silge*, 510 F.3d at 161 n.5.

cases involving default judgments, regardless of whether the defaulting defendant voluntarily appeared and argued an issue beyond the pleadings. *See, e.g., WMS Gaming Inc. v. WPC Prods. Ltd.*, 542 F.3d 601, 606 (7th Cir. 2008) ("[B]ecause this was a default judgment, the usual rule that a party should be given the relief to which it is entitled whether or not it has requested that relief does not apply."); *Fong v. United States*, 300 F.2d 400, 413 (9th Cir. 1960) ("[W]e are unable to escape the explicit and emphatic mandate of Rule 54(c) which unmistakably commands that . . . the judgment shall not be different in kind from or exceed in amount that prayed for in the demand for judgment.") (internal quotations omitted). Moreover, as noted by the Wright and Miller treatise, the literal meaning of Rule 54(c) embodies the drafters' intent:

> Rule 54(c) does not differentiate between a default based on a total failure of defendant to appear and a default following an appearance. Interestingly, the drafters of the federal rules did draw that distinction in other places. Thus, the notice provisions of Rule 55(b)(2) apply only "if the party against whom judgment by default is sought has appeared in the action" and Rule 5(a) requires service of all papers subsequent to the complaint on all parties except "parties in default for failure to appear." The absence of any words of qualification or differentiation in the first sentence of Rule 54(c) indicates that the provision is intended to apply to all cases of default, whether they involve a party who "has appeared" or one "in default for failure to appear." This conclusion is reinforced by the statement in Rule 55(d) that: "In all cases a judgment by default is subject to the limitations of Rule 54(c)." Judge Charles E. Clark, who was instrumental in the drafting of the rules, recognized this construction of Rule 54(c) when he commented: "the federal rule might well have gone further and restricted the judgment to the demand only when the defendant had not appeared …."

10 Fed. Prac. & Proc. Civ. § 2663 (3d ed. 2009) (internal citations omitted).

Although the Eleventh Circuit has not offered any clear guidance on this issue, two cases of binding precedent have recognized that Rule 54(c) limits the relief that may be granted in cases involving default judgments. In *Equity Capital Co. v. Sponder*, 414 F.2d 317 (5th Cir. 1969), the panel noted that "[e]xcept for a default judgment, the prayer of the complaint is irrelevant under

[Rule 54(c)] as to relief." *Id.* at 319 n.1. Further, in *Cohen v. Office Depot, Inc.*, 184 F.3d 1292 (11th Cir. 1999), *vacated in part on other grounds*, 204 F.3d 1069 (11th Cir. 2000), the Eleventh Circuit relied on the literal meaning of Rule 54(c) as it pertains to default judgments in rejecting the argument that Rule 54(c) eviscerates the requirement of Rule 8(a)(3) that the plaintiff include a demand for relief in its pleadings:

> [T]he portion of Rule 54(c) relating to default judgments provides that where the party against whom the claim is brought fails to defend against the claim, the relief awarded in a default judgment shall not be different in kind from or exceed in amount that prayed for in the demand for judgment. Thus, that part of Rule 54 actually reinforces Rule 8(a)(3)'s direction that the relief sought be included in the complaint.

*Id.* at 1198 (internal quotations omitted).

Finding no binding authority to the contrary, the Court will apply Rule 54(c) as it is written. Accordingly, the only relief that may be granted on the Council's claim for conversion is the return of the Equipment to the Council because that was the only form of relief demanded.[10] The Court now addresses what Equipment may be ordered returned to the Council based on the evidence in the record.

### 2. Return of the Equipment

Having found that the Council has established a claim for replevin of the Equipment against the Rasmussens, the Rasmussens must return all Equipment in their possession, custody, or control, whether direct or indirect, to the Council. *See Bush v. Belenke*, 381 So. 2d 315, 316 (Fla. 3d DCA 1980) ("[I]n a replevin action, . . . [i]t is sufficient if a defendant has constructive possession, that

---

[10] Alternatively, no monetary damages may be awarded on the Council's claim for conversion because there is no admissible evidence in the record of the value of the Equipment. *See infra* note 11 (finding that Kenneth Estes' testimony as to the value of the Equipment is inadmissible).

is has such control over the property that he may deliver the possession of it, if he so desires, as for example, where an agent holds property for his principal.")  The Court need not determine whether the Parents' Association of Community Excellence, f/k/a Parents Association of Pack, Troop, and Crew 700 ("Parents' Association"), or any other person or entity owns the Equipment because the sole legal issue in a claim for replevin "is the right of immediate possession, not ownership or title." *Williams Mgmt. Enters., Inc*, 489 So. 2d at 164.  The Court now turns to the evidence in the record to determine what items constitute the Equipment that the Rasmussens must return to the Council.

The Council attempted to introduce into evidence a list naming equipment stored in the Pack, Troop, and Crew trailer and stating a value for each item listed ("Trailer List").  (Def. Ex. 1.)  The Trailer List was compiled by Kenneth Estes, the Pack, Troop, and Crew Quartermaster, who testified that he was familiar with the equipment contained in the trailer because he accessed the equipment weekly as Quartermaster.  (Doc. No. 223 at 14-15.)  The Council offered the Trailer List into evidence to prove what equipment was stored in the trailer, and the Trailer List was admitted for that specific purpose without objection.[11]  (*Id.* at 24-25.)

_____

[11] The Court reserved ruling as to whether the prices shown on the Trailer List were admissible. (Doc. No. 224 at 100.)  The Court now addresses that issue.  It is clear that an officer of a corporation is competent to testify about the value of corporate property if the officer "is qualified by virtue of his experience, his management of the affairs of the corporation, and his knowledge of relevant value."  *Electro Servs., Inc. v. Exide Corp.*, 847 F.2d 1524, 1526 (11th Cir. 1988) (citing *Mercury Marine Div. v. Boat Town U.S.A., Inc.*, 444 So. 2d 88, 90 (Fla. 4th DCA 1984)).  However, there is no evidence in the record that Estes was an officer of the Church. Because the Church owned the Equipment as the chartered organization of the Pack, Troop, and Crew 700, Estes could not testify as to value of property owned by the Church under the rule set forth in *Electro Services*.  (Doc. No.  17 ¶ 24; Doc. No. 224 at 21, 74.)

Estes' asserted that he derived the value of the 6' x 10' Cargo King Trailer from the price of a new trailer with the same dimensions advertised for sale on the internet.  (Doc. No. 224 at 102.) Even if, as the Council asserts, Estes could have lawfully testified as to the sales price of a new trailer from an internet advertisement pursuant to Federal Rule of Evidence 803(17), there was no

(continued...)

Estes maintained that he compiled the Trailer List after he became aware of the Council's conversion claim in 2007 and that he compiled the Trailer List by relying on his own memory from having dealt with the Troop and Pack Equipment. (Doc. No. 224 at 108.) Estes asserted how and when some of the equipment listed in the Trailer List was acquired, including merit badge books, a trailer, lettering on the trailer, shelving inside the trailer, a golf cart, ten used canoes, twelve canoe paddles, a Resusci Baby CPR mannequin, four Little Annie CPR mannequins, a senior patrol leader handbook, two photo albums, ten Ozark Trail camping tents, thirteen tarps, six large coolers, four dutch ovens, several patrol boxes, a coffee maker, several propane lanterns, several deluxe camp stoves, a propane distribution post, a hand truck, a tool kit, two first-aid kits, a compass training kit, and a Grand Prix Racing Pinewood Derby Racetrack. (Doc. No. 223 at 15-16.) This undisputed testimony by Estes sufficiently proved that the items stated in the Trailer List were in fact acquired by the Pack, Troop, and Crew 700 and thus were owned by the Church and assigned to the Council.

Palma Rasmussen testified that all of the equipment that was in the Trailer when the scouting units were dissolved in November 2007 remains in the Trailer and that the Trailer is located on the

---

[11](...continued)
evidence that Estes knew how to derive the value of a four-year old trailer in excellent condition from the sales price of a new trailer found on the internet. (Doc. No. 224 at 109.)

Estes' testimony as to the value of the golf cart is also inadmissible. Although Estes asserted that the golf cart was in excellent condition, the record does not show how Estes valued the golf cart at $2000 based on three used golf carts advertised for sale on the internet for $1950, $2,900, and $3,695. (*Id.* at 111.) For the same reason, Estes' valuations of the canoes and the canoe trailer based on internet prices of used canoes and canoes trailers is inadmissible. (*Id.* at 113-16.)

Estes maintained that he based his valuation of the motorcycle tents and, in part, the canoes on prices quoted to him by retailers over the telephone. (*Id.* at 115, 117-19.) Estes' testimony about the prices quoted to him by retailers is hearsay without an exception and is inadmissible. Fed. R. Evid. 801-02. Finding that Estes' testimony as to the value of the items on the Trailer List is inadmissible, the Council's Motion to Admit Evidence of Equipment Valuation should be denied. (Doc. No. 222.)

property of Gwen Colvin. (Doc. No. 224 at 21.) Palma Rasmussen also testified that the canoes and canoe trailer, which appear on the Trailer List, were taken to the property of Gwen Colvin. (*Id.* at 14-15.) Palma Rasmussen asserted that the Equipment was used by the Parents' Association at times and that the Parents' Association would be using the Equipment for canoeing and camping but for the pending litigation. (*Id.* at 22, 31.) Keith Rasmussen testified that the Parents' Association owned and took control of the Equipment from the Church. (*Id.* at 67-68.) He also asserted that the canoes were not being used on advice of counsel. (*Id.* at 81-82.) Notwithstanding where the items on the Trailer List are currently stored and who has been using the property since the scouting units were dissolved, it is clear from the Rasmussens' testimony and other evidence in the record that the Rasmussens have direct or indirect possession, custody, or control of the Equipment listed in the Trailer List. (Doc. No. 223 at 72-73; Doc. No. 224 at 14-19, 21-22, 28, 31, 67, 81-82; Doc. No. 17-1 at 2-3.) Accordingly, the Rasmussens must surrender to the Council the items listed in the Trailer List.

Although the Trailer List contains a vague listing for a "golf cart," the evidence in the record shows that the Council is entitled to possession of the golf cart donated by Brevard Community College to the Pack, Troop, and Crew 700 ("BCC Golf Cart"). Billie Taylor, the manager of inventory services for Brevard Community College, and Harold Grounds, the head mechanic for the maintenance department at Brevard Community College, testified that they were involved in the donation of the BCC Golf Cart to the Pack, Troop, and Crew 700 in 2007. (Doc. No. 223 at 38-42, 45-46.) Grounds asserted that he selected the BCC Golf Cart from the fleet of golf carts at Brevard Community College, and he identified the BCC Golf Cart as the golf cart shown in the bottom photograph of Defendant's Exhibit 4, which was entered into evidence without objection. (*Id.* at 47-

48; Def. Ex. 4.)  Grounds maintained that the BCC Golf Cart, like several other golf carts in the Brevard Community College fleet, contained a custom-made aluminum box that was bolted onto the back fenders with two supports.  (Doc. No. 223 at 47-48.)

The Rasmussens testified that they possessed a golf cart.  (Doc. No. 224 at 17, 82-83.)  The photograph of the BCC Golf Cart in Defendant's Exhibit 4 was attached as an exhibit to an affidavit of Palma Rasmussen, in which she averred under penalty of perjury that she purchased the BCC Golf Cart herself.  (Doc. No. 144-1 at 3, 11.)  Based on the Court's observation of the witnesses as they testified and its review of the record, credibility determinations on this issue are resolved in favor of the Council and against the Rasmussens.  Regardless of whether the Rasmussens claim ownership of the BCC Golf Cart, it is clear from the testimony of Billie Taylor and Harold Grounds that the Council is entitled to possession of the BCC Golf Cart.  Accordingly, the Rasmussens must deliver possession of the BCC Golf Cart to the Council.

## Conclusion

Based on the foregoing, it is hereby **ORDERED** and **ADJUDGED** that:

1. The Motion for Default Judgment by Counterclaim Plaintiff Central Florida Council Boy Scouts of America (Doc. No. 210) is **GRANTED** as follows:

   a. The Clerk of Court shall enter judgment in favor of the Counterclaim Plaintiff Central Florida Council Boy Scouts of America and against the Counterclaim Defendants Palma Rasmussen and Keith Rasmussen in the amount of $32,728.78.

   b. The parties shall confer and advise the Court within fourteen (14) days from the date of this Order of the date, time, and, location where the Rasmussens

will voluntarily surrender to the Council the items listed on the Trailer List in their possession, custody, or control, whether direct or indirect ("Surrender Date"). The Council shall advise the Court within fourteen (14) days from the Surrender Date whether the Rasmussens failed to surrender to the Council any items listed in the Trailer List and whether any additional relief is sought for the return of those items. If a writ of replevin is requested, the Council shall include a description of the claimed property that is sufficient to make possible its identification by an officer executing a writ.

2. The Motion to Admit Evidence of Equipment Valuation by Counterclaim Plaintiff Central Florida Council Boy Scouts of America (Doc. No. 222) is **DENIED**.

3. All claims for costs or attorneys' fees shall be asserted by counsel in a separate motion pursuant to Local Rule 4.18.

**DONE** and **ORDERED** in Chambers in Orlando, Florida on March 28, 2010.

PATRICIA C. FAWSETT, JUDGE
UNITED STATES DISTRICT COURT

Copies furnished to:

Counsel of Record